193 N.J. Super. 271 (1983)
473 A.2d 554
WILLIAM MARLEY, PLAINTIFF/COUNTER DEFENDANT,
v.
BOROUGH OF PALMYRA, DEFENDANT/COUNTER PLAINTIFF, THIRD PARTY PLAINTIFF,
v.
SELECTED RISKS INS. CO., THIRD PARTY DEFENDANT/SECOND PARTY PLAINTIFF,
v.
WILLIAM MARLEY, SECOND PARTY DEFENDANT/THIRD PARTY PLAINTIFF ON THE COUNTERCLAIM,
v.
BOROUGH OF PALMYRA, GRACE A. CARR, HELEN COLES AND JOHN W. SACCA, JR. INDIVIDUALLY AND IN THEIR INDIVIDUAL CAPACITIES; JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, THIRD PARTY DEFENDANTS ON THE COUNTERCLAIM,
v.
THE BANK OF NEW JERSEY, FOURTH PARTY DEFENDANT.
Superior Court of New Jersey, Law Division Burlington County.
Decided September 7, 1983.
*280 John F. Pilles, Jr., Mount Holly, for plaintiff/counter defendant (Hartman, Schlesinger, Schlosser & Faxon, Mount Holly, attorneys).
Bernard F. Boglioli, West Long Branch, for third party defendant/second party plaintiff Selected Risk Ins. Co. (Boglioli & Stein, West Long Branch, attorneys).
Richard E. Gehret, Mount Holly, for third party defendant on counterclaim Sacca.
*281 Janet Miller, Mount Holly, for third party defendants on counterclaim Carr and Coles (James Logan, Jr., Mount Holly, attorney).
Morton R. Branzburg, Westmont, for fourth party defendant Bank of New Jersey (Fellheimer, Eichen & Goodman, Westmont, attorneys).
Barry T. Parker, Marlton, for third party defendant on counterclaim Borough of Palmyra (Parker, McCay & Criscuolo, Marlton, attorneys).
HAINES, A.J.S.C.
This opinion considers the application of the New Jersey Tort Claims Act (the act) to claims, counter-claims and cross-claims involving the Borough of Palmyra, four of its employees and its bonding company, Selected Risks. The provisions of the act primarily involved are those which establish immunity for law enforcement actions and for failure to enforce the law.
The Palmyra Borough Council adopted a water conservation program providing for the distribution of water-efficient showerheads to be provided by Conservco, Inc. The borough assumed no financial responsibility for the program; Conservco was to be reimbursed for its expenses by a local developer. Conservco, however, requested Marley, The Borough Administrator, to advance borough monies for the showerheads, promising repayment when the developer honored its reimbursement agreement. Marley, anxious to get the program started, complied with the request. At his direction, Grace Carr, the Borough Clerk, drew a check against borough funds for $22,787.50 payable to Conservco. The Borough Treasurer, Helen Coles, signed the check and affixed the signature of Mayor John Sacca to it by using a stamp which he kept in a safe accessible to the other officials. Conservco cashed the check, never provided the showerheads and decamped with the borough's money.
The procedure employed in the issuance of the check violated requirements of the borough's ordinances and N.J.S.A. 40:94-3, *282 a circumstance known to Marley, Cole and Carr. These laws required all bills to be approved by the borough council and signed by the mayor. Checks in payment were to be signed by the borough clerk, treasurer and mayor. The check to Conservco was issued without the approval of the borough council; the voucher which it covered had not been signed by the mayor.
After these facts became known, the borough council discharged Marley. He was entitled to three months' severance pay, pursuant to N.J.S.A. 40A:9-138, which the borough refused to pay and for which this suit was instituted. The borough counterclaimed for the monies Marley paid Conservco and filed a third-party complaint against Selected Risks to recover the same monies, claiming that a bond issued by that carrier naming Marley as principal, covered its loss. The bonding company then sued Marley on tort and contract theories; it also claimed indemnification from Sacca, Coles and Carr.[1] Marley, in turn, sued the borough, Carr, Coles and Sacca, seeking contributions from them as joint tortfeasors. In response to earlier motions, the borough has paid Marley's claim for severance pay and the bonding company has paid the borough $22,787.50 for the Conservco loss. The issues discussed below are raised by motions for summary judgment.

THE APPLICATION OF THE TORT CLAIMS ACT TO THE PUBLIC EMPLOYEES
N.J.S.A. 59:3-3 provides, in part:
A public employee is not liable if he acts in good faith in the execution or enforcement of any law.
N.J.S.A. 59:3-5 provides:
A public employee is not liable for an injury caused by his adoption of or failure to adopt any law or by his failure to enforce any law.
Marley, Carr, Coles and Sacca claim that these statutory provisions provide them with immunity from claims involving the *283 Conservco transactions since these claims arise from law enforcement activities. The defenses raise difficult questions of interpretation. These immunity sections of the act seem to reestablish disappearing concepts of liability for municipalities and their employees based upon active-passive wrongdoing distinctions, under which municipalities acting in a governmental capacity, and perhaps municipal employees, were liable for a tort only when "active wrongdoing" occurred, not in cases involving an omission, a failure to act. Several cases have held municipalities immune from liability under the act's provisions dealing with failure to enforce a law; none has addressed the statutory distinctions considered here. See Brothers v. Highlands, 178 N.J. Super. 146, 151 (App.Div. 1981); Diodato v. Camden Co. Park Comm., 162 N.J. Super. 275 (Law Div. 1978); Cogsville v. Trenton, 159 N.J. Super. 71 (Law Div. 1978); Danow v. Penn Central Transp. Co., 153 N.J. Super. 597 (Law Div. 1977); Cadmus v. Long Branch Bd. of Ed., 155 N.J. Super. 42 (Law Div. 1977); National Spring Co. v. Pierpont Ave. Assoc., 146 N.J. Super. 63 (Law Div. 1976).
N.J.S.A. 59:3-3 provides immunity in connection with the "good faith" enforcement of a law. N.J.S.A. 59:3-5 provides immunity for the failure to enforce any law, omitting any "good faith" requirement and thereby making an obvious distinction between the two immunity provisions. A public employee who is enforcing a law (an act of commission) must prove good faith in order to enjoy immunity, while one who fails to enforce a law (an omission) need not. The difference is emphasized by N.J.S.A. 59:2-4 which provides the municipality itself with immunity for failure to enforce a law and makes no "good faith" requirement, thus paralleling N.J.S.A. 59:3-5, the public employee section. The municipality is not provided with immunity as to the enforcement of a law but is so provided, under N.J.S.A. 59:2-2, for "an act or omission of a public employee where the public employee is not liable." Consequently, the availability of public employee immunity may determine the liability of the municipality itself. The necessity for establishing *284 a workable interpretation of the two immunity provisions is clear.
At first blush, the suggestion that the immunity provisions must be distinguished seems too obvious to require argument. The Legislature enacted them in separate sections, using different language. Consequently, they are distinct. They establish a commission-omission dichotomy. This simplistic response, examined historically, logically and intellectually, however, is unsatisfactory.
The clear trend of judicial thought in New Jersey has been toward the elimination of the governmental-proprietary or passive-active wrongdoing approach to tort liability claims against public entities. That approach, discussed, e.g., in Cloyes v. Delaware Twp., 23 N.J. 324 (1957), required proof of active wrongdoing before a public entity, acting in a governmental capacity and not a proprietary one, could be liable for a tort. In B.W. King v. West New York, 49 N.J. 318, 324 (1967), our Supreme Court called for a new approach. It held that a municipality owning real property "has the same duties and liabilities in connection with the prevention of the spread of fire" as private owners. It rejected the passive-active wrongdoing test, restricting the rejection, however, to the circumstances of the case. It suggested the adoption of a substitutionary rule, saying:
The problem should be approached by the court on a gradual case by case basis, permitting a new theory to metamorphize slowly. A firm rule can evolve with additional experience. The analytical approach ought not to be one of asking why immunity should not apply in a given situation but rather one of asking whether there is any reason why it should apply. [at 325]
K.S.B. v. No. Jersey Dist. Water Supply, 75 N.J. 272, 288 (1977), rejected the governmental-proprietary distinction in a matter dealing with water distribution. The Court noted that the distinction had been eliminated in tort cases. In Bergen v. Koppenal, 52 N.J. 478 (1968), a municipality which had knowledge of a broken traffic light was held to possible liability for failure to act in an emergent situation. Active wrongdoing was *285 not discussed. In Jackson v. Hankinson, 51 N.J. 230, 231 (1968), the Court refused to apply the active wrongdoing test in circumstances involving a school child  school bus injury. Tower Marine v. New Brunswick, 175 N.J. Super. 526 (Ch.Div. 1980) sounded a final note, holding that the governmental-proprietary or active-passive wrongdoing distinction had been extinguished by the Tort Claims Act. Tower Marine was correct, generally, but not, as this opinion shows, in the context of law enforcement liability.
The active wrongdoing test seems to have been the rule for municipal employees acting within the scope of their employment, as well as for municipalities, although this is not entirely clear. Thus, in Milstrey v. Hackensack, 6 N.J. 400 (1951), the court held a municipal engineer liable in a tort action, saying:
It is a settled rule in this State that public officers have no protection "from the consequences of their misfeasance in the performance of their public duties," as distinguished from a mere negligent omission or nonfeasance. [at 412]
See also Florio v. Jersey City, 101 N.J.L. 535 (E. & A. 1925). Milstrey was a four to three decision. The dissent, in a lengthy analysis, was of the opinion that a municipal employee, acting in his public capacity and discharging a duty to his municipal employer under circumstances in which the municipality itself was liable, should be immune. The Milstrey majority rule remained in effect at the time the Tort Claims Act was adopted. In Cloyes v. Delaware Twp., supra, however, the Court said:
The parties did not raise, brief or argue the question whether the individual defendants may be held for mere inaction in the face of alleged notice of a dangerous condition. We accordingly have not considered the question and express no view with respect to it. [23 N.J. at 336-337]
The Court cited Milstrey.
Logically, the distinction between active and passive wrongdoing, between commission and omission, between action and failure to act, in many cases is a distinction without a difference. The problem was noted (and by-passed) in Cloyes v. Delaware Twp., supra, involving the death of a child who crawled under a gate:

*286 ... The facts of the present case sharply expose the fine line which may separate active wrongdoing from a mere failure to act. The sewage disposal plant was enclosed by a cyclone fence. The evidence would warrant a finding that the lad entered the premises by crawling through an opening of some 18 inches beneath the gate. It could be found that as initially erected the space beneath the gate was too slight to permit a child to enter, but erosion of the soil caused the enlargement. If the situation is viewed in terms of failure to repair, the answer would be for defendant. But if the situation is viewed in terms of failure to provide against such erosion by the installation of an appropriate base beneath the gate, then it is claimed the wrongdoing was active, i.e., improper construction. [at 330]
Prosser, Handbook of the Law of Torts (4 ed. 1971) speaks in terms of misfeasance and malfeasance:
In theory the difference between the two is simple and obvious; but in practice it is not always easy to draw the line and say whether conduct is active or passive. [at 339]
The present case illustrates the problem: the failure to obtain approvals for the issuance of the check may have been passive wrongdoing while issuance of the unapproved check may have been active wrongdoing.
The only intellectually satisfying basis for a commission-omission concept is one based upon knowledge which the actor had or reasonably should have had, coupled with resulting action. Cadmus v. Long Branch Bd. of Ed., supra, 155 N.J. Super. at 47, suggests this. "Knowledge" may be either conscious or required, i.e., imputed for liability purposes. One who is aware of a certain law or a certain fact has conscious knowledge. Theoretically, then, failure to enforce that law or to address that fact in discharge of a duty to do so is action; consciously ignoring a legal requirement is an act of will. This concept, for use in the courts, however, requires a practical approach; detection of the conscious and the unconscious in the mind of man, absent an admission, is possible only through the observation and interpretation of action. Consequently, we do not penalize our fellows for a failure to make some part of the body move in response to their mental gyrations. We require an act of will to be exhibited before it has legal consequences. The rule is set forth in Restatement, Torts 2d, § 2, Comment A. (1965):

*287 Some outward manifestation of the defendant's will is necessary to the existence of an act which can subject him to liability.
Prosser, supra, says:
To result in liability, the defendant's act must be a voluntary one. But a voluntary act, reduced to its lowest terms, is a contraction of the muscles, and nothing else. [at 31]
Wigmore discusses the problem of proving knowledge, belief or consciousness and points to three kinds of evidence used for the purpose: (1) conduct or behavior which "illustrates and points back to the state of mind producing it;" (2) external circumstances, "calculated by their presence or occurrence to bring about the state of mind in question," and (3) a prior or subsequent state of mind which "indicates, within certain limits, its existence at the time in question." 2 Wigmore, Evidence (3 ed. 1940), § 244. Actors may be liable without conscious knowledge. In certain circumstances, the law requires (imputes) knowledge. One who is put on notice of certain events, for example, may not ignore their portents with impunity. When dealing with knowledge of the law our imputation process goes further, generally recognizing the old adage that "ignorance of the law is no excuse." Thus, the Restatement, Torts 2d, supra, § 290 provides:
For the purpose of determining whether the actor should recognize that his conduct involves a risk, he is required to know
....
(b) The common law, legislative enactments and general customs insofar as they are likely to affect the conduct of the other or third persons.
These definitions and uses of the words "knowledge" and "act" must be applied when interpreting the active-passive distinctions apparently resurrected by the Tort Claims Act in the present instance.
An added problem arises when the commission-omission test is applied to a sequence of events, some lawful, some not, some active, some passive. The solution, described in Kelley v. Curtiss, 29 N.J. Super. 291 (App.Div. 1954), rev'd on other grounds 16 N.J. 265 (1954), encouraged liability:

*288 To be active, there must be a "positive, affirmative act." In other words, in the sequence of events each of which becomes a proximate cause of the injury, there must be a wrongful act (as distinguished from a mere failure to act) on the part of some municipal officer, agent or servant. The last event in that sequence may be non-action; but that does not render the prior act immune.... [29 N.J. Super. at 297; citations omitted]
Thus, in McAndrew v. Mularchuk, 33 N.J. 172 (1960), a special officer, uninstructed in the use of a pistol, accidentally shot a man. The municipal employer was held liable; its active wrongdoing consisted of sending the untrained officer into the field. The failure to instruct, an omission, was only a link in the chain of events. Here, arguably, it is the same. The failure to obtain approvals for the check was only a step in the activities consummated by its issuance. Consequently, the chain of events rule must be considered as part of the present examination.
The exploration of tort-claims laws enacted in other jurisdictions, which sometimes provides insight, is of little help here. Thorough research reveals that California (the New Jersey model) and Illinois are the only States which have adopted tort claims laws having immunity provisions similar to those involved in the present controversy. California Gov't Code, § 820.4, provides, in part:
A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law.
§ 821 provides:
A public employee is not liable for an injury caused by his adoption of or failure to adopt an enactment or by his failure to enforce an enactment.
California courts have held that these immunity statutes apply only to discretionary activities and do not bar liability for breach of a mandatory duty. Roseville Community Hospital v. State, 74 Cal. App.3d 583, 141 Cal. Rptr. 593 (App.Ct. 1977); Morris v. Marin County, 18 Cal.3d 901, 136 Cal. Rptr. 251, 559 P.2d 606 (Sup.Ct. 1977). They have not considered the relationship of § 820.4 and § 821 to each other and have not discussed the "due care" language in the first section or the effect of its absence in the second.
*289 The New Jersey Tort Claims Act also distinguishes mandatory and discretionary actions, using the term "ministerial" rather than "mandatory." Thus, N.J.S.A. 59:3-2 provides immunity for discretionary but not for ministerial activities. The discretionary-ministerial distinction, however, does not apply when express immunities are provided. In Malloy v. State, 76 N.J. 515, 521 (1978), the Court held that the immunity conferred upon a licensing body was effective whether or not the act was discretionary or ministerial. The California distinction was refused application. In Bosch v. Hain, 184 N.J. Super. 204 (Law Div. 1982), the court held that the discretionary-ministerial test did not apply to immunity provisions under N.J.S.A. 59:2-4, which states that public entities are not liable for failure to enforce any law. It is clear from these cases that the immunity given to public employees in New Jersey with respect to law enforcement is not lost because an act is ministerial or mandatory.
The applicable Illinois immunity provisions are found in Ill. Rev. Stat. ch. 85 (1979):
§ 2-202:
A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton negligence.
§ 2-205:
A public employee is not liable for an injury caused by his adoption of, or failure to adopt, an enactment, or by his failure to enforce any law.
These provisions, while worded somewhat differently from New Jersey's, incorporate the same surface inconsistency. The first section conditions enforcement immunity on the absence of willful or wanton conduct while the second contains no conditions. The problem has been addressed in one reported decision, the only opinion on the subject in any jurisdiction: Emulsicoat v. Hoopeston, 99 Ill. App.3d 835, 55 Ill.Dec. 176, 425 N.E.2d 1349 (App.Ct. 1981). This case involved a suit for damages by a subcontractor against a city and some of its employees for failure to obtain a contractor's bond as required by an Illinois statute. The court held that the duty to obtain the bond was *290 mandatory, not discretionary, but, unlike California, found that the immunity sections of the Illinois law applied. The court, considering what it referred to as apparently irreconcilable immunity provisions, distinguished them on the basis of § 202's reference to an employee's "act or omission" and § 205's exemption from liability resulting from "an injury" caused by failure to enforce a law. These language differences led to the conclusion that § 202 referred to the "primary" or "direct" action of an employee while § 205 referred to "decisional" or "secondary" action of another. The court explained:
Under this rationale, the on-duty policeman who failed to enforce a posted speed limit would not be liable for an accident caused thereby, unless his actions were willful and wanton, under Section 2-202; the police chief who failed to instruct the patrolman to enforce the limit would not be liable under section 2-205. The "act" of the policeman, if willful and wanton, is actionable and there is no immunity; the "injury caused by" the failure of the police chief is not actionable.
We therefore conclude that Section 2-202 is aimed at the direct action of the employee, while Section 2-205 is aimed at the decisional action of others. Under this reasoning, Collins and Redden had immunity under either Section 2-202 or 2-205. The pleadings are insufficient to show whether the failure to require bond was their direct action, or their decision. If it were direct, there is no allegation of willful and wanton conduct and hence immunity exists under Section 2-202. If it were their decision to be carried out by others, immunity exists under Section 2-205. [99 Ill. App. at 841, 55 Ill.Dec. at 181, 425 N.E.2d at 1354].
The New Jersey immunity provisions also refer to "act" in N.J.S.A. 59:3-3 and to "injury" in N.J.S.A. 59:3-5. Adoption of the Illinois rationale would therefore resolve the apparent inconsistency in our statutes. Unfortunately, the Illinois analysis overlooks the basic reasons for the use of the word "act" in one section of its law and "injury" in the other, making it unacceptable for our purposes. There is no "act" without an external manifestation of the actor's will. Restatement Torts 2d, supra. Thus, as this opinion later holds in the case of the New Jersey statute, a failure to enforce a law should be construed as a failure to "act," in the Restatement sense. A failure to act is not an act although it may cause an injury; it is therefore correct grammatically and otherwise, to exclude liability for an *291 injury in the case of a failure to enforce a law, while excluding liability for an act in the case of law enforcement. Recognition of this distinction, coupled with proper definitions of "knowledge," would permit the supervisor's liability, and the servant's, to be determined on the basis of what they knew, or were required to know, and what they did or did not do. Their positions in the employment hierarchy would not matter.
The law enforcement immunity difficulty presented by the New Jersey, California and Illinois statutes is not found elsewhere. The similar provision in the Federal Tort Claims Act, 28 U.S.C.A. § 2680, avoids it in typical fashion by providing:
(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
An additional example is provided by Indiana's Code of Civil Procedure, 34-4-16.5-3, which states:
A governmental entity or an employee acting within the scope of his employment is not liable if a loss results from
....
the adoption and enforcement of or failure to adopt or enforce a law, including rules and regulations, unless the act of enforcement constitutes false arrest or false imprisonment.
Customary rules of statutory construction, applied here, provide assistance in determining the legislative intent incorporated in our law enforcement immunity provisions. Thus, our Legislature is presumed to have known the state of the law when it adopted the Tort Claims Act. See Wright v. South Orange, 79 N.J. Super. 96, 102 (App.Div. 1963). It is presumed to have acted logically. See Restaurant Enterprises Inc. v. Sussex Mutual Ins. Co., 52 N.J. 73 (1968). The act is in derogation of common law doctrines of sovereign immunity; it is therefore to be strictly construed but not in a way which defeats the legislative purpose. Pinckney v. Jersey City, 140 N.J. Super. 96, 100 (Law Div. 1976). See also Dacunzo v. Edgye, *292 19 N.J. 443 (1955). In ascertaining that purpose, prior law should be considered as well as the reason and spirit of the new statute. DeFazio v. Haven S. & L. Ass'n, 22 N.J. 511, 518-519 (1956). A legislative intent to change prior law must be clearly and plainly expressed. Carlo v. Okonite-Callender Cable Co., 3 N.J. 253 (1949). The Tort Claims Act, recognizing the trend toward increased municipal tort liability, was designed to codify exposures and immunities. The comment to N.J.S.A. 59:2-1 states that the basic approach of the act "shall be that immunity of all governmental bodies in New Jersey is re-established." It also directed that the approach to immunity be "... whether an immunity applies and if not, should liability attach ...," thereby differing with the suggestion of the Supreme Court in B.W. King v. West New York, supra.
Application of these general rules of statutory procedures to the Tort Claims Act, as well as historical and logical considerations produce the following conclusions:
(1) There is no clearly expressed intention of the Legislature to restore governmental-proprietary or passive-active wrongdoing concepts. The comments to the act are silent in this respect and restoration appears to be effected only with respect to law enforcement immunity.
(2) The Restatement requirements concerning "knowledge" and "acts," applied to the immunity provisions, permit logical and practical distinctions to be drawn. They illuminate the reasons underlying the use of the word "act" in one section and "injury" in another. The enforcement of the law involves an outward manifestation of will and is an "act." Failure to enforce the law involves no external movement, no act; consequently, there can be no liability for an act, only for an injury resulting from the failure to act. When a sequence of events is involved, one enforcement event which constitutes an "act" will stamp the entire sequence as an "act" regardless of other events which involve failures to act.
(3) The difference between actions to enforce the law and failures to enforce the law should be read narrowly, logically and with a sensitivity to history. That reading will permit appropriate recognition of N.J.S.A. 59:2-2 which provides:
a. A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances.
b. A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable.

*293 Thus, liability, on the principle of respondeat superior, is established expressly for both acts and omissions, subject to immunities otherwise provided in the act. The reference to an "act" or "omission" reflects an intention to eliminate active-passive tort distinctions, an intention, however, not found in the act's law enforcement immunity provisions.
The application of these conclusions produces the following results:
(a) N.J.S.A. 59:3-3, providing immunity for the good faith enforcement of a law, applies only when an act has taken place with knowledge of the facts and the law. An "act" requires an external manifestation of the actor's will. "Knowledge" may be actual or required (imputed). Knowledge of facts is required when the actor has notice of circumstances which necessitate inquiry or from which she may be expected to draw appropriate inferences. Knowledge of the law is always required.
(b) N.J.S.A. 59:3-5, providing immunity for failure to enforce a law, applies when there is no "act," as defined in (a) above, even though the actor has or is required to have knowledge of the law or the facts or both.
(c) N.J.S.A. 59:2-4 must be read in the same way as N.J.S.A. 59:3-5.
(d) When there is no knowledge, actual or required, no duty arises and no question of immunity is involved.
These conclusions do not complete the work of interpretation. There remains the matter of "good faith," absent which there is no immunity under N.J.S.A. 59:3-3. The meaning of "good faith" must be reviewed in the light of N.J.S.A. 59:3-14 a which provides:
Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.
Are "willful misconduct" and "good faith" no more than opposite sides of the same coin? The answer is important when considering the burden of proof. An employee claiming immunity under N.J.S.A. 59:3-3 must prove "good faith," while a claimant, seeking to overcome the immunity defense, or a public entity, seeking to avoid vicarious liability, must prove "willful misconduct." Unless these terms can be distinguished as other than opposites, the burdens of proof will collide since both parties will have the burden of proving what is essentially the same thing.
"Good faith" has been defined variously. As used in the Uniform Fraudulent Conveyance Act, it has been held to mean *294 "honesty of purpose and integrity of conduct with respect to a given subject." Smith v. Whitman, 39 N.J. 397, 405 (1963). Roget's Thesaurus (3 ed. 1962), § 972.7, equates "good faith" with "fidelity," "loyalty" and "bona fides." Siano v. Helvering, 13 F. Supp. 776, 780 (D.N.J. 1936) defines "good faith" as
... [H]onesty of intention and freedom from knowledge of circumstances which ought to put the holder upon inquiry.
Funk & Wagnall's Standard College Dictionary (1977) defines "willful" as "voluntary; intentional;" to behave (oneself) improperly." Lobdell Car Wheel Co. v. Subielski, 32 Del. 462, 125 A. 462, 464 (1924) held that
[a] willful act may be described as one done intentionally, knowingly and purposely, without justifiable excuse, as distinguished from an act done carelessly, thoughtlessly, needlessly, or inadvertently.
"Misconduct" in Mandella v. Mariano, 61 R.I. 163, 200 A. 478, 479 (1938) was said to be
[a] transgression of some established and definite rule of action, a forbidden act, a dereliction from duty, unlawful behavior, willful in character, improper or wrong behavior. Synonyms are misdemeanor, misdeed, misbehavior, delinquency, impropriety, mismanagement, offense, but not negligence or carelessness.
These definitions are illustrative. They show that "good faith" and "willful misconduct" need not be true opposites as used in the Tort Claims Act. I find they are not. Had the intention been otherwise, the use of the words "good faith" and "bad faith," obvious opposites, would have been expected. Lustrelon v. Prutscher, 178 N.J. Super. 128, 144 (App.Div. 1981). Furthermore, if the terms "good faith" and "willful misconduct" are interpreted as truly opposite, one term becomes redundant. Such statutory construction is to be avoided. Mentus v. Irvington, 79 N.J. Super. 465 (Law Div. 1963). A coupling of the Smith and Siano language produces an acceptable definition. "Good faith" is honesty of purpose and integrity of conduct without knowledge, either actual or sufficient to demand inquiry, that the conduct is wrong. Required (imputed) knowledge of law is not a part of the definition. Reckless action may deny good faith. "Willful misconduct" is the commission of a forbidden act *295 with actual (not imputed) knowledge that the act is forbidden. It is more than an absence of "good faith."
"Willful misconduct" does not refer to negligence; it is much more. "Good faith" may exist in the presence of negligence. That this is true seems apparent from our Legislature's use of the words "good faith" instead of "due care," as found in the Federal Tort Claims Act, supra. The absence of due care is negligence; the absence of good faith may not relate to negligence. The New Jersey act therefore provides immunity to public employees engaged in law enforcement notwithstanding their negligence, so long as they act in "good faith."
One other condition in the act must be considered before final conclusions can be reached concerning the application of the immunity provisions to the parties in this case. N.J.S.A. 59:3-14 provides that an employee is not exonerated from liability "if it is established that his conduct was outside the scope of his employment." It is argued here, for example, that the borough's employees were hired to enforce its ordinances and our statutes, not to ignore them or to enforce them improperly, and that such actions would take them outside the scope of their employment. That term, however, is employed more broadly than the argument suggests. The proper rule is discussed in DiCosala v. Kay, 91 N.J. 159 (1982):
The scope of employment standard, concededly imprecise, is a formula designed to delineate generally which unauthorized acts of the servant can be charged to the master. Furthermore, the standard refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment. Conduct is generally considered to be within the scope of employment if it is of the kind that the servant is employed to perform; it occurs substantially within the authorized time and space limits; and it is actuated at least in part by a purpose to serve the master. [at 169; citations and quotation marks omitted]
A jury may find that the acts of the instant defendants provided no benefit to them and were incidental to their employment. It may also find that the acts were of the kind they were employed to perform and intended to serve their *296 employer even though the procedures were entirely improper. The problem has been given recent attention in Gotthelf v. Property Management Systems v. Window Systems, 189 N.J. Super. 237 (App.Div. 1983). In that case, the court quoted with approval from Prosser, Handbook of the Law of Torts (4 ed. 1971), § 70 at 460-461, as follows:
This highly indefinite phrase which sometimes is varied with "in the course of employment", is so devoid of meaning in itself that its very vagueness has been of value in permitting a desirable degree of flexibility in decisions. It is obviously no more than a bare formula to cover the unordered and unauthorized acts of the servant for which it is found to be expedient to charge the master with liability, as well as to exclude other acts for which it is not. It refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment. [at 240]
The "scope of employment" question here must be tested in the light of these rules and submitted to the jury accordingly. It should be noted that under N.J.S.A. 59:3-14, an employee will not be exonerated if his conduct was "outside the scope of his employment or ... constituted willful misconduct." Emphasis supplied. Consequently, willful misconduct would defeat a claim even though an employee was within the scope of his or her employment.

THE PRESENT CONSEQUENCES OF THE ANALYSIS
(1) Marley, Coles and Carr gave directions, affixed signatures, and issued the check. These are acts involving the improper enforcement of the law. They were accompanied by failures to enforce the law but the presence of acts in the chain-of-events eliminates any immunity claim for those failures. N.J.S.A. 59:3-5 does not apply. Only "good faith" immunity, under N.J.S.A. 59:3-3, is available to these parties. They have no immunity if their acts were outside the scope of their employment or were willful, both jury questions here. "Good faith," normally also a jury question, is not one on present facts. All of these parties admittedly knew that they were violating the law when they issued the check. Such knowledge makes *297 "good faith" impossible. Reliance on the directions of a superior or on past improper practices is not, in either case, an ingredient of good faith. As a consequence, they have no immunity. Marley is liable to the borough and the bonding company for his tort; Coles and Carr are joint tortfeasors, liable to Marley and the bonding company only, since they were not sued by the borough.
(2) Sacca is charged with negligence in leaving his signature stamp in the safe, where it was readily available to others, and with failing to discharge his duty as mayor to see that the municipal employees enforced the law regarding the issuance of borough checks. He is immune with respect to the stamp theory. This was a discretionary act for which N.J.S.A. 59:3-2 provides immunity. His liability for not enforcing the law turns on the question of knowledge. He may not have known the law was being ignored. If so, no duty to act ever arose. If he did know, and failed to act (moved no muscle), he could claim immunity for failure to enforce the law. Since, however, the placement of the stamp involved action and is an event coupled with the failure to enforce the law, the failure, as part of the chain, is to be regarded as action, not inaction. He may still have immunity for enforcing the law provided he proves good faith. Actual or required knowledge would deny good faith. Usually, knowledge is a jury question. Here, however, a close examination of the record reveals that Sacca not only did not know the law was being ignored but also lacked any factual information which would impute such knowledge to him. Sacca is entitled to a summary judgment dismissing the complaint against him.
(3) The borough is sued by Marley on the theory that it failed to enforce the law, or enforced it improperly, through its governing body and other employees. It is a governmental entity, capable of acting only through its personnel. It is provided with express immunity under N.J.S.A. 59:2-4 and with vicarious immunity under N.J.S.A. 59:3-5 for failure to enforce *298 the law. Conceivably, that immunity is available with respect to claims based upon the governing body's failure to act. However, the facts to support that defense are not clear and must therefore be addressed by a jury.
Marley's claim against the borough, based upon the conduct of Coles and Carr, is affected by N.J.S.A. 59:2-2 which provides:
a. A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances.
b. A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable.
As a result of these provisions the borough is liable to Marley, since Coles and Carr are liable to him unless both Coles and Carr acted outside the scope of their employment, N.J.S.A. 59:2-2 a, or acted willfully, N.J.S.A. 59:2-10. These issues raise jury questions and cannot be resolved on a summary judgment motion.
(4) Some loose ends left by these conclusions should be tied together. Since Marley, Coles and Carr are joint tortfeasors, a jury is required to assess the percentage of negligence attributable to each under principles of comparative negligence. A separate percentage must be assessed against the borough in connection with the Marley claim if it is found liable for the action of its governing body. The borough, if it does not escape vicarious liability for the actions of Carr and Coles is subject to the provisions of N.J.S.A. 2A:53A-1 which provides: "A master and servant or principal and agent shall be considered a single tortfeasor."

THE NOTICE REQUIREMENT OF THE TORT CLAIMS ACT
The Borough of Palmyra moves for dismissal of plaintiff Marley's claim for contribution on the ground of noncompliance with the notice requirements of N.J.S.A. 59:8-8(a). It is admitted *299 that plaintiff has never filed a notice of claim with the borough as required by that legislation.
Ordinarily, plaintiff's failure to give notice would mandate dismissal of the suit. Speer v. Armstrong, 168 N.J. Super. 251, 255 (App.Div. 1979); N.J.S.A. 59:8-3. Whether the notice provisions of N.J.S.A. 59:8-3 apply to third-party claims for contribution has not been decided by an appellate court. See D'Annunzio v. Wildwood Crest, 172 N.J. Super. 85 (App.Div. 1980), where the court, by way of dicta, approved the holding of Markey v. Skog, 129 N.J. Super. 192 (Law Div. 1975), which permitted a third-party action against a public entity for contribution even though plaintiff had not made a timely direct claim against it. That question need not be reached here.
It is well settled that the notice requirements of the Tort Claims Act are subject to the application of estoppel principles. Hill v. Middletown Bd. of Ed., 183 N.J. Super. 36, 40 (App.Div. 1982). A public entity will be estopped from asserting noncompliance with the notice provisions of the act "where the interests of justice, morality and common fairness dictate that course." Ibid. Equitable estoppel is commonly defined as "conduct, express or implied, which reasonably misleads another to his prejudice so that repudiation of such would be unjust in the eyes of the law." Id. at 41. It embodies the doctrine "that one shall not be permitted to repudiate an act done or position assumed where that course would work on injustice to another who, having the right to do so, detrimentally relied thereon." The objective impression created by the actor's conduct is the linch pin of estoppel. Ibid.
Application of the equitable estoppel principle is appropriate here. The borough waited approximately 15 months after the Marley complaint was filed before raising the issue. In the interim, it completed discovery, including depositions. Plaintiff's action for contribution was brought as a result of defendant's counterclaim against him. The borough's failure to raise the notice issue as a defense until now created the objective *300 impression that it was waiving the notice requirement. It prejudiced Marley. Early notice would have permitted him to supply the omission by giving notice within 90 days under N.J.S.A. 59:8-8 a or within one year, if permitted by the court under N.J.S.A. 59:8-9.

THE FIDUCIARY OBLIGATION
Quite clearly, all of the employees here involved had fiduciary obligations. They were public servants. Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 474-475 (1952), cert. den. 344 U.S. 838, 73 S.Ct. 25, 97 L.Ed. 652 (1952); Riddlestorffer v. Rahway, 82 N.J. Super. 423, 427 (Law Div. 1964). The borough, in suing Marley, is enforcing that obligation on behalf of the public, an alternative to its tort theory of action. Its fiduciary claim is nevertheless subject to the provisions of the act. That act, as its short title "Tort Claims Act" (established by N.J.S.A. 59:1-1) indicates, and as the legislative declaration in N.J.S.A. 59:1-2 states, deals with negligence. However, except for these incidental references, it does not refer to torts and has no express provision limiting its application to tort claims.
The contrary is, in fact, the case. N.J.S.A. 59:1-3 defines "injury" as follows:
"Injury" means death, injury to a person, damage to or loss of property or any other injury that a person may suffer that would be actionable if inflicted by a private person.
N.J.S.A. 59:2-2 provides that a public entity is liable for "injury" to the "same extent as a private individual." No "tort" limitation is mentioned. N.J.S.A. 59:3-1 refers to public employees' liability for an "injury." The words "tort" or "negligence" do not appear. The same is true of N.J.S.A. 59:8-3 dealing with procedure. This chapter is headed "Claims Against Public Entities," emphasis supplied, and uses the word "claim" throughout with no limitation. For example, N.J.S.A. 59:8-7 merely refers to "[a] claim for damage or injury arising under this act...."
*301 Logically, the act should apply. Public employees and public entities are vastly exposed to claims based upon both tort and fiduciary theories. Both, as here, apply to the same conduct in many instances. The purposes of the act would be ignored if its provisions were applied to a tort claim but not to a fiduciary claim in the same factual setting. The Restatement, Torts 2d, supra, § 874 at 102 defines a breach of a fiduciary duty as a tort.

THE BONDING COMPANY
Selected Risks issued a bond naming itself as surety, Marley as principal and the borough as obligee. In response to the borough's claim (now paid) under the bond for the monies lost through Marley, Selected Risks seeks reimbursement from him on theories of subrogation and contract and from Sacca, Carr and Coles on the theory of subrogation.
N.J.S.A. 59:9-2(e) provides in pertinent part:
No insurer or other person shall be entitled to bring an action under a subrogation provision in an insurance contract against a public entity or public employee.
In S.E.W. Friel Co. v. New Jersey Turnpike Auth., 73 N.J. 107 (1977), our Supreme Court upheld the statute, construing it to bar an action where an insurance company had paid the amount of a loss to its named insured and then sought to recover that amount from a public entity.
The Appellate Division, in D'Annunzio v. Wildwood Crest, supra, authored an exception to the subrogation proviso. In that case the court held that N.J.S.A. 59:9-2(e) did not bar an insurer which had settled the claim of a third-party from bringing an action for contribution on its claim that the public entity or public employee was a joint tortfeasor with its named insured. In reaching its conclusion, the court stated:
We conclude that the Legislature, by the provisions of N.J.S.A. 59:9-2(e) did not intend to bar claims for contribution, and hence the ban on suits by insurance carriers and others based on subrogation does not apply to claims for contributions by them as tortfeasors against tortfeasors.

*302 If the ban against insurance carriers or others in N.J.S.A. 59:9-2(e) were construed to apply to claims for contribution, we believe it would unnecessarily interfere with settlements that would otherwise promptly provide an injured party with funds for medical treatment and other losses. The insurance carrier would be placed in a position in which it would not settle until the public entity or public employee were found to be a joint tortfeasor and liability apportioned. Such a result would be contrary to the legislative purpose of granting compensation within the limitations of the act to those who are injured. [172 N.J. Super. at 92].
Marley, Carr and Coles are joint tortfeasors. Sacca may be one depending upon the jury's conclusions. As to them, under the D'Annunzio rule, the subrogation claim may not be dismissed.
Selected Risks also claims that these public employees acted outside the scope of their employment. If so, they would be without the protection afforded by N.J.S.A. 59:9-2(e). Cucci v. Jaldini, 141 N.J. Super. 297 (App.Div. 1976) so holds. The court there said that in the event an employee acted outside the scope of his employment
... he would be liable "as any person in the private sector." N.J.S.A. 59:3-14(b) provides that nothing in the Tort Claims Act "shall exonerate a public employee from the full measure of recovery applicable to a person in the private sector if it is established that his conduct was outside the scope of his employment...." [at 300]
The same conclusion would apply if the employees are found guilty of willful misconduct, since N.J.S.A. 59:3-14 b also denies exoneration to an employee in such case.
Finally, the carrier suggests that it has an alternative contractual basis for its suit against Marley. I agree. The Tort Claims Act does not apply to contract claims. N.J.S.A. 59:1-4. The bond created a contract between Marley and the surety, Selected Risks, by virtue of which, without the necessity of express language, he is obliged to exonerate the surety. This obligation is so clear that our courts will provide a surety with equitable protection, requiring the principal to pay the claim without its prior payment by the surety. Salitan v. Magnus, 28 N.J. 20 (1958).
NOTES
[1] The company's suit against The Bank of New Jersey is not considered in this opinion.