**Daniel J. SULLIVAN, Saul Satulsky and Satvan Industries, Inc., Plaintiffs,**

v.

**STATE OF NEW JERSEY, DIVISION OF GAMING ENFORCEMENT, Irwin Kimmelman, James Zazzali, Michael G. Brown, Mary Jo Flaherty, Robert Sturges, Irving Schecter, John Rogalski, Douglas Weber and Guy S. Michael, Defendants.**

Civ. A. No. 83–3892.

United States District Court, D. New Jersey.

Feb. 14, 1985.

Brown, Brown & Furst, P.C. by Raymond A. Brown, Susan S. Singer, Newark, N.J., for plaintiffs.

Irwin I. Kimmelman, Atty. Gen. of New Jersey by Eugene J. Sullivan, Asst. Atty. Gen., Emerald L. Erickson, Deputy Atty. Gen., Trenton, N.J., for defendants.

## OPINION

GERRY, District Judge.

This is an action for injunctive relief and damages based upon claims under 42 U.S.C. § 1983 and upon state law claims of tortious interference with contractual relations and interference with prospective economic advantage. The jurisdictional bases of the complaint are 28 U.S.C. § 1343 (civil rights) and 28 U.S.C. § 1331 (federal question) and, as to the state law claims, 28 U.S.C. § 1332 (diversity of citizenship) and the principles of pendent jurisdiction.

The gravamen of the complaint is that during an investigation concerning the Trump Plaza Corporation and its principals conducted by the Division of Gaming Enforcement in deciding Trump's casino license application, the individual defendants destroyed a valuable economic relationship between the plaintiffs and the real estate developer Donald J. Trump. This behavior allegedly resulted in the plaintiffs' loss of a contract to purchase a dry wall cement business located in New York and in various other business and employment opportunities.

The plaintiffs in this action include two individuals and a corporation. The primary plaintiff is Daniel J. Sullivan, a professed labor consultant and owner of land in Atlantic City, New Jersey, which was leased to a casino license applicant. Sullivan also alleges that he owns a trash-hauling firm in Bucks County, Pennsylvania, where he resides. The other plaintiffs are Saul Satulsky, a New York resident, and Satvan Industries, Inc. (Satvan). Sullivan and Satulsky allege that they are each thirty percent shareholders of Satvan, a New York corporation, established for the purpose of acquiring and operating a sheet rock contracting company known as Circle Industries. It is also alleged that Satulsky was President of Circle Industries.

The individuals named as defendants include the present Attorney General, a former Attorney General, a former Director of the Division, a former Acting Director of the Division who was also Deputy Director for part of the relevant time period, another Deputy Director of the Division, all of whom were Assistant Attorneys General, and a Deputy Attorney General of the Division. The four remaining defendants are the Division or State itself and three individuals who served the Division in an investigatory capacity during the Division's investigation of the casino license application in question.

The claims asserted in the complaint arose from Sullivan's association with prominent developer and businessman Donald J. Trump (Trump) and the Division's investigation and report filed with the Casino Control Commission with respect to Trump's application for a casino license under the New Jersey Casino Control Act, N.J.S.A. 5:12-1 et seq. (the Act). Trump, through Trump Plaza Corporation, applied

for a casino license in May, 1981. Sullivan was one of three individuals in a partnership which owned a portion of the land on which Trump intended to build his casino hotel and which was leased for the casino. The Act empowers the Casino Control Commission to determine whether a casino license should be issued and, if so, on what conditions. N.J.S.A. 5:12–63, 64. The Act also empowers and requires the Division to investigate all applications and the qualifications of all applicants for casino licenses, and to provide the Commission with all information necessary under the Act in order to insure, among other things, that undesirable elements have no control of or authority in casino operations. N.J.S.A. 5:12–76, 5:12–87(a), 5:12–94(a) and 5:12–1(b)(7). In investigating an applicant, the Division must investigate the applicant's personal and business associations because associations may have bearing on the reputation and economic stability of the applicant, and associates could have controlling influences upon the applicant.

The Division submitted a report to the Commission on Trump's May 1, 1981 application for a casino license, dated October 16, 1981. It reported that it made no objection to the corporate application or to Trump individually as its owner. The report contains an 11 page discussion of Sullivan because of his association with Trump on the lease and in other matters. Sullivan alleges in the complaint that the statements about him were defamatory, and that the statements were publicized by the Division in a press conference when the report was filed. He also claims that Division officials threatened Trump that it would delay the investigation of Trump's application and withdraw from an agreement to recommend that the lessors of the casino property need not be separately licensed, if Trump maintained any associations with Sullivan beyond the lessor-lessee relation already in existence with respect to the casino property.

In count I of the complaint, the only count asserting a federal claim, plaintiffs allege that the defendants' conduct represents a blatant interference with the plaintiffs' right to be free from deprivations of liberty and property without due process of law, in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment. Specifically, plaintiffs allege that defendants deprived Sullivan of his right to be free of arbitrary actions by the state government and its officials which damage his reputation and stigmatize him and which deprive him of his property, business and contractual relations, employment opportunities and freedom of association, all without notice and an opportunity to be heard.

In count II of the complaint, plaintiffs claim that the Division intentionally interfered with plaintiffs' contractual relations with Trump. Specifically, plaintiffs allege that because of the Division's threats, Trump determined not to join with Sullivan and Satulsky for the acquisition of Circle Industries, or to issue a $3.5 million guarantee on a line of credit for Satvan in connection with the acquisition. In count III of the complaint, plaintiffs again allege that the defendants maliciously interfered with the Circle Industries acquisition, and further that they did so to retaliate against Sullivan. Finally, in count IV of the complaint, Sullivan claims that he was deprived of other business opportunities with Trump, including an opportunity to act as a labor consultant in 1982 in connection with the construction of Trump's casino, again because the defendants continued to threaten Trump if he associated with Sullivan. Plaintiffs seek $30 million in compensatory damages, punitive damages and attorney fees from the individual defendants. As to all defendants, including the State, they seek an order "enjoining them from arbitrarily interfering, without an adequate hearing, Sullivan's liberty and property interests in entering into contracts and maintaining business and social relationships with Trump."

This case is presently before the court on two motions: first, plaintiffs' motion to drop the State of New Jersey, Division of Gaming Enforcement from the action; and, second, defendants' motion to dismiss the

complaint. The motions will be discussed in turn.

## I. PLAINTIFFS' MOTION TO DISMISS STATE OF NEW JERSEY, DIVISION OF GAMING ENFORCEMENT FROM ACTION.

Plaintiffs have moved to drop the State of New Jersey, Division of Gaming Enforcement, from this action. Since the defendants have indicated that they have no objection to the plaintiffs' motion, the court will grant the motion and order that the action against the State of New Jersey, Division of Gaming Enforcement, be dismissed in accordance with F.R.Civ.P. 41(a)(2).

## II. DEFENDANTS' MOTION TO DISMISS COMPLAINT.

The defendants' motion to dismiss the complaint against them must be considered in two parts. First, the court will address the viability of the plaintiffs' § 1983 claim. Next, the court will turn to the plaintiffs' state law claims of tortious interference with contractual relations and prospective economic advantage.

### A. § 1983 CLAIM.

From the plaintiffs' explanation in their brief opposing defendants' motion for summary judgment, it appears that the rationale behind their § 1983 claim is as follows: the defendant state officers, under color of the state laws and regulations pertaining to casino licensing, subjected (or caused to be subjected) the plaintiffs to a deprivation of their property and liberty interests secured by the Constitution without due process of law. The property interest in the case apparently consists of contracts with Trump which are recognized and protected by state law. The liberty interest deprivation allegedly consisted of the State's stigmatization of Sullivan's reputation, coupled with tangible injury, namely the impaired contractual relations with Trump. Plaintiffs claim that they were deprived of these rights without due process because they had no notice that their contractual relations with Trump were in jeopardy and no opportunity to be heard in this regard.

### 1. DEPRIVATION OF PROPERTY.

▮ Even accepting all of plaintiffs' factual allegations as true, the court finds that plaintiffs have not stated a cause of action under § 1983. Assuming *arguendo* that contract rights are considered "property" for purposes of the Fourteenth Amendment and § 1983—a proposition which plaintiffs assert without citing any case law on point—and assuming further that plaintiffs had already acquired legally cognizable rights under such contracts—a disputed issue—there is nevertheless no § 1983 violation here. Any injury which the plaintiffs sustained by a breach of contract here is not a deprivation attributable to a person acting under color of state law as required by § 1983. If plaintiffs have suffered any redressable harm, it resulted from the independent decision of Trump to repudiate his contractual obligations, rather than from the actions of state officers.

▮ To adopt the plaintiffs' contentions and to allow them to pursue their § 1983 claim in a case where their alleged deprivation of property resulted only indirectly, if at all, from the conduct of state officers would be to engage in an unwarranted expansion of the reach of § 1983. Although the language of the statute itself—which imposes liability on a state officer who "subjects or *causes* to be subjected" another to a constitutional deprivation—could be broadly interpreted to allow an action whenever a state officer is indirectly involved in the chain of events leading to plaintiff's harm, the courts have not read § 1983 in this way. This reluctance to impose liability for indirect involvement underlies the Third Circuit rule that liability may not be imposed in § 1983 suits on the basis of *respondeat superior*. *See DeTore v. Local #245 of the Jersey City Public Employees Union,* 615 F.2d 980 (3d Cir. 1980). Section 1983 looks to *personal action* in the deprivation of constitutional rights, rather than damage alleged by a chain of various responsibility. *See, e.g.,*

*Boyd v. Adams,* 364 F.Supp. 1180 (N.D.Ill. 1973), *aff'd in part, rev'd in part on other grounds,* 513 F.2d 83 (7th Cir.1975). Furthermore, this personal action must be fairly attributable to the state, so that the "under color of state law" requirement of § 1983 parallels the state action requirement of the Fourteenth Amendment. *United States v. Price,* 383 U.S. 787, 794–95 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966).

In the present case, the court finds that the state did not deprive plaintiffs of their property within the meaning of § 1983. Giving the non-moving party the benefit of the most favorable reading of the facts here, it is possible that the plaintiffs could show that the state officers ordered Trump to cease all dealings—including existing contracts—with Sullivan as a prerequisite to obtaining a casino license. Even if this were true, however, the choice between breaching the contract and pursuing a casino license was totally up to Trump, a private individual. In addition, this is not a case where the actions of a private person such as Trump may be charged to the state so as to satisfy the state action requirement. There is simply no basis for a finding that Trump—the party directly responsible for any injury experienced by plaintiffs—was himself a state actor in this case.

Finally, the expansive interpretation of § 1983 suggested by the plaintiffs would conflict with the pronouncements of the Supreme Court on the strict interpretation of requirements of standing to sue in federal court. In its interpretation of the "case or controversy" limitation of Article III, the Supreme Court has consistently held that "a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976); *Maryland v. Louisiana,* 451 U.S. 725, 736, 101 S.Ct. 2114, 2123, 68 L.Ed.2d 516 (1981). As stated above, the state offi-

cers in this case are one step removed from the harm inflicted upon plaintiffs, and the injury is more directly attributable to a party—Trump—not now before the court.

■ As an aside, the court wishes to note that the possibility that plaintiffs may have colorable state law claims for tortious interference with contractual relations and prospective economic advantage against the state officers—putting aside for the moment issues of sovereign immunity—does not dictate that we find a colorable § 1983 claim as well. The state law theories impose liability for *interference* with contractual relations and economic advantage, while § 1983 speaks of a *deprivation.* A finding that the state officers interfered with the plaintiffs' business relations need not lead to the conclusion that they deprived plaintiffs of their property. The nature of these state law claims is that they impose liability on persons outside the contractual relationship in issue. That is, they allow recovery despite the independent decision of a contracting party to breach or to discontinue future dealings. As stated earlier, this imposition of liability on a person one step removed from the harm is antithetical to the scope of § 1983.

■ Furthermore, the possibility that the plaintiffs may maintain an action for tortious interference with contractual relations and prospective economic advantage is in itself a basis for finding that plaintiffs have not been deprived of property without due process. At least with respect to the *property* deprivation allegation, the court believes that *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) and *Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) state the appropriate legal guidelines. According to those cases, where the state tort law provides adequate remedies to redress property deprivations, the requirements of due process have been satisfied. There is no evidence here that the state tort remedies are inadequate to redress any property deprivation that may have occurred. In addition, if plaintiffs are correct in their asser-

tion that the defendants' actions were outside the scope of their authority, then sovereign immunity under New Jersey law does not bar their claim. N.J.S.A. 59:3–14 explicitly provides that a public official is not shielded from liability and damages under the Tort Claims Act "if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct." Thus, principles of sovereign immunity under state law would not render the state tort law remedy "inadequate" under *Parratt*.

■ There is yet another reason to conclude that the state has not acted to deprive plaintiffs of property rights in this case. Assuming *arguendo* that plaintiffs have a constitutionally protected interest in the contracts in this case, there is no indication that plaintiffs are precluded from vindicating their rights through a breach of contract action. This opportunity to invoke the jurisdiction of the court to sue and recover damages to obtain the benefit of their bargain also prevents the plaintiffs from maintaining that the *state* has deprived them of their constitutionally protected property rights in contracts.

## 2. DEPRIVATION OF LIBERTY.

According to plaintiffs, the actions of defendants here also worked to deprive them of a liberty interest protected under the Fourteenth Amendment. Plaintiffs' theory is that the defendants stigmatized them and simultaneously caused them to lose a protected right in their contractual relations with Trump. By characterizing the case in this way, the plaintiffs hope to bring the action within the framework of the "stigma-plus" cases, which hold that a liberty interest is implicated if the defamation, in addition to injuring reputation, also causes the loss of some legally protected right or status. *See Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). For the reasons set forth below, however, the court believes that the plaintiffs' liberty claim must fail.

■ According to *Paul,* the touchstone of "stigma-plus" analysis, in order to recover for deprivation of liberty, the plaintiff must establish that the defamation or "stigma" occurred in the course of denying him a previously recognized legal right or status—the "plus." In each of the cases leading up to *Paul,* and relied upon by the court in *Paul,* "as a result of the state action complained of a right or status previously recognized by state law was distinctly altered or extinguished." *Paul,* 424 U.S. at 711, 96 S.Ct. at 1165. In all of these cases, there was *direct* governmental action involved in the "plus", such as the denial of the right to purchase liquor, *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), or the termination of government employment, *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In short, a *sine qua non* of a "stigma-plus" suit is that the "plus" must be the result of state action directly affecting the plaintiff's rights or status under the law. The fact that state action may be involved in the "stigma" (*i.e.,* defamation) is not of itself sufficient to maintain the action.

■ Of the many cases cited in plaintiffs' brief, only one, *Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981), suggests a contrary result. In footnote 23 of that opinion, the Fifth Circuit opined that the fact that the injury to the "plus" in that case depended on the reactions of third parties to the defamatory statements made by the Government was immaterial. With all respect to the Fifth Circuit, this court does not believe that the logic of *Paul* leads to such a conclusion. The *Marrero* court supported its proposition by asserting that the Supreme Court, "by acknowledging in *Paul* that defamation alone would be actionable under § 1983 if the State recognized reputation as a liberty or property interest ... implicitly rejected any notion that state action is not the cause of the injury to reputation." *Marrero,* 625 F.2d at 516 n. 23. Regardless of whether this latter statement is true or false, the court

does not believe that it supports the aforementioned proposition. If a state recognizes reputation as a liberty interest or property right, then the very act of defamation itself infringes on the right and is actionable under § 1983 if performed under color of state law. Put another way, the "stigma" itself supports the cause of action, so that there is no need to go into "stigma-plus" analysis or to determine whether state action was involved with the "plus."

In the present case, there has been no contention that reputation in itself has the status of a property right or liberty interest. Thus, there can be no argument that the alleged injury to reputation itself equals the extinguishment or alteration of a right or status as required under *Paul.* Where state law does not accord property right/liberty interest status to reputation, for a court to require a showing of state action only as to "stigma" portion of the "stigma-plus" test would be to do away with the latter prong of the test. If plaintiff only has to show that the state defamed him—and not that the state did something else as well—in order to state a claim for deprivation of liberty under § 1983, the effect would be to transmute all defamation actions against state actors in which plaintiff can show some harm resulting from the defamation into § 1983 actions. This is clearly in conflict with the intent of *Paul,* which explicitly warns against turning the Fourteenth Amendment and § 1983 into "a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul,* 424 U.S. at 701, 96 S.Ct. at 1160.

Applying the foregoing principles to the case now at bar, the court believes that the plaintiffs' claim for deprivation of liberty must fail as a matter of law. Even accepting all of plaintiffs' factual allegations as true, it cannot be said that the state has acted to deprive plaintiffs of any legal rights or altered plaintiffs' legal status under the rationale of *Paul.* Plaintiffs are still free to contract with Trump in the future, and they are free to go into court to attempt to enforce the arguably binding existing contract. Unlike the case of *Constantineau,* where plaintiff was *forbidden by law* from purchasing alcohol, the present case involves no such direct governmental action. As discussed earlier in this opinion, the choice to cease business relations with Sullivan rested in the sole discretion of Trump and resulted, if at all, only indirectly from governmental action.

Even assuming that the rationale of *Paul* would support a deprivation of liberty claim where the "plus" occurred at the hands of private individuals, the plaintiffs still could not prevail in the instant action. Allowing such a cause of action would appear to constitute an unanticipated expansion of the scope of "stigma-plus" protection. It cannot be said that the "right to be free from government stigma combined with a cessation of business dealings by private parties"—if such a right exists at all—was clearly defined at the time of the allegedly wrongful acts by state officials. In view of this, the qualified immunity discussed in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), would insulate the state officers from liability under § 1983.

In sum, defendants' motion for summary judgment as to the § 1983 claim is granted.

## B. STATE LAW CLAIMS.

In addition to their claims under § 1983, plaintiffs also seek to recover under state law for tortious interference with contractual relations, tortious interference with prospective economic advantage and malicious interference with prospective economic advantage. In their submissions in support of summary judgment, the defendants have failed to address themselves to the substance of plaintiffs' allegations. The defendants mischaracterize plaintiffs' causes of action as defamation and malicious prosecution when in fact plaintiffs have pleaded neither of these. This renders defendants' arguments largely inapposite.

The only relevant reasons that defendants have advanced for dismissing the state law claims appear in a footnote of their brief, where they argue the applicability of statutory immunity. From the record now before the court, however, it is not possible to conclude that the defendants are entitled to rely on these immunities.

While the defendants cite to three New Jersey immunity provisions, N.J.S.A. 59:3–3, 59:3–8 and 59:3–10, in a footnote at page 60 of their brief, they have failed to set out with specificity the factual basis which entitles them to these immunities. Furthermore, even if it could be said that these provisions would otherwise be applicable, plaintiffs argue that they are superseded by N.J.S.A. 59:3–14, which states that the immunities shall not apply where the public official acted outside the scope of his employment or if his action constituted a crime, actual fraud, actual malice or willful misconduct. Obviously, the question of the applicability of these immunity provisions involves disputed issues of fact and precludes this court from granting summary judgment on the state law claims at this time. The court, however, invites the defendants to renew their motion, should they so desire, and to accompany it with sufficient legal and factual background for the court to make an informed decision as to the application of the state law immunities. Should the defendants choose to renew their motion, they should address themselves with particularity to the import of *Marley v. Palmyra Bar,* 193 N.J.Super. 271, 473 A.2d 554 (1983) and other cases interpreting the scope of the immunity, whether the standard is an objective or subjective one, etc.

For all the foregoing reasons, defendants' motion for summary judgment is granted as to the § 1983 claims and denied without prejudice as to the state law claims.

The court will enter the accompanying order.