Michael COOPER, Husband, in his Own Capacity and as Parent of Abram and Adam Cooper, minors; Lidia Cooper, Wife, in her Own Capacity and as Parent of Abram Cooper and Adam Cooper, Minors, Plaintiffs–Appellees,

v.

Clarence DUPNIK, Sheriff, Pima County; Tom Taylor, an Employee of Pima County Sheriff's Department; Weaver Barkman, an Employee of Pima County Sheriff's Department, Defendants–Appellants.

Michael COOPER, Husband, in his Own Capacity and as Parent of Abram and Adam Cooper, Minors; Lidia Cooper, Wife, in her Own Capacity and as Parent of Abram Cooper and Adam Cooper, Minors, Plaintiffs–Appellees,

v.

Clarence DUPNIK, Sheriff, Pima County, Defendant,

and

City of Tucson; Tucson Police Department; Peter Ronstadt; Karen Wright; Gene Scott; Timothy O'Sullivan; Kay McCall, Defendants–Appellants.

Nos. 88–15661, 88–15685.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 11, 1989.

Feb. 6, 1991.

---

1522

Michael P. Callahan, Deputy County Atty., Tucson, Ariz., for defendants-appellants Clarence Dupnik and Tom Taylor.

David L. Berkman, Murphy, Goering, Roberts & Holt, Tucson, Ariz., for defendant-appellant Weaver Barkman.

David F. Toone, Kimble, Gothreau & Nelson, Tucson, Ariz., for defendant-appellant Peter Ronstadt.

Stephen M. Weiss, Karp, Stoklin & Weiss, Winton D. Woods, Michael J. Bloom, Tucson, Ariz., for plaintiffs-appellees.

Before HALL, BRUNETTI and NOONAN, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Appellants Dupnik, Taylor and Barkman, from the Pima County Sheriff's Department, and appellants Ronstadt and Wright, from the Tucson Police Department, join in this consolidated appeal of the district court's denial of their motions for summary judgment based upon the affirmative defense of qualified immunity. The district judge had denied summary judgment on this ground after appellee Cooper brought suit under 42 U.S.C. § 1983 and pendent state claims for police misconduct surrounding his arrest.

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. The district court's denial of qualified immunity is an appealable final decision within the meaning of section 1291, notwithstanding the absence of a final judgment, based upon the "collateral order" doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 524–29, 105 S.Ct. 2806, 2814–17, 86 L.Ed.2d 411 (1985). We affirm in part and reverse in part.

## I

In this consolidated appeal, there are two groups of appellants: Pima County, the Pima County Sheriff's Department and its employees, Sheriff Clarence Dupnik ("Dupnik"), Detective Weaver Barkman ("Barkman") and Sergeant Tom Taylor ("Taylor"); and the City of Tucson, the City of Tucson Police Department and its employees, Detective Karen Wright ("Wright"), Chief of Police Peter Ronstadt ("Ronstadt") and the identification technicians. The appellees, Mr. Michael Cooper ("Cooper") and his wife Lidia Cooper, sued on behalf of themselves and for their minor children, Abram and Adam Cooper.

There are two major issues before us, the "interrogation issue" and the "def-amation issue." The former affects both appellant groups and the defamation issue applies only to the Tucson Police Department appellants.

## A

From 1984 through September of 1986, a serial rapist had been suspected in a chain of rapes, robberies, and kidnappings in the metropolitan Tucson area. In response to this, in April of 1986, the Tucson Police Department and the Pima County Sheriff's Department, the two police agencies with enforcement responsibilities in that area, formed a joint task force whose objective was to apprehend the person or persons responsible. These attacks had received considerable attention in the media and the suspect became known as the Prime Time Rapist. Prior to the arrest of Cooper, the task force determined that, when they arrested the Prime Time Rapist suspect, they would continue to ask him questions despite his request for silence or for an attorney.[1]

Cooper also contends that it is the accepted procedure of the Tucson Police Department and the Pima County Sheriff's Department to ignore a defendant's invocation of his Miranda rights in certain cases. This contention is the subject of much dispute, though the district judge found enough evidence of this to allow the question to reach the jury. The attorney for Pima County admitted that there is some evidence in the record that the Pima County Sheriff's Department and the Tucson Police Department have been disregarding defendants' requests for counsel, at their discretion, since 1981.

Defendants Taylor, Barkman, and Wright concede that they intended to implement a plan to continue questioning the suspect during a custodial arrest in this particular case, despite his request for counsel.[2] The investigators understood

---

**1.** Appellants state that this is because the psychological profile of the rapist indicated that he was "con-wise" and, if interrogated, would demand the presence of an attorney. They claim that the violent nature of the series of incidents and public safety demanded that the police ob-tain more information than following *Miranda* would allow.

**2.** Cooper was the second person to be interrogated under this plan. The first was Mr. John David Harrell, who also invoked his rights only

that the statements thus obtained would not be admissible in a criminal trial. However, they believed such statements might be held to be voluntary and thus could be used for impeachment purposes, to keep the defendant off the stand, or to deprive him of the opportunity of forming an insanity defense. There is conflicting evidence as to whether appellant Dupnik was aware of or approved of this plan. Appellants concede, however, that for purposes of this appeal, the conflict in evidence must be resolved in favor of the plaintiff.

On May 7, 1986, following an oral report from Tucson Police Department identification technicians that two sets of latent prints found at the scene of two of the crimes attributable to the Prime Time Rapist had been identified as being those of Cooper, Taylor ordered the arrest of Cooper. Barkman and Wright met with Cooper for about thirty minutes at the probation office at 3:00 p.m. Miranda warnings were read, and a prearrest interview of Cooper took place. Following this, Cooper was placed under arrest, whereupon he made his first unequivocal request to contact his attorney. That request was never honored, nor were any of the several following requests.

During the probation interview, Cooper had been told that his prints matched those found at the scene of two of the Prime Time Rapist's crimes. He was also told that his prints matched crime scene prints from another attributed serial incidence when the officers actually possessed no such information. During the time between Cooper being placed under arrest and the time he was transported to the Pima County Sheriff's Department, the interrogation ceased. Upon their arrival at the Pima County Sheriff's Department, Wright advised Taylor that Cooper had requested an attorney, and Taylor told her to commence interrogating him anyway. Cooper was interrogated by appellants Wright, Barkman, and Detective Hust[3] in an interrogation room at the Pima County Sheriff's Department for approximately four hours. Participating officers were aware that Cooper's request for an attorney should have been honored and that they were violating *Miranda* in refusing to supply him with one.

During the interrogation, Cooper was visibly upset, sometimes angry and sometimes crying. During one stage of the interrogation, Barkman made reference to Cooper's Judaic background, stating that "some of my friends are Jewish and they tell me that guilt is built in, to be Jewish is to be guilty." At about 9 p.m., after more than four hours of interrogation, Cooper was booked into the Pima County Jail. At that time, another request for counsel was made and ignored. Cooper had no contact with the outside world, including his family or an attorney, until the afternoon of the next day when he was released nearly twenty-four hours after his arrest.

It was later determined that the latent fingerprints found at the scene of the crime were definitely not Cooper's. A mistake had been made by the identification technicians, which is the subject of 42 U.S.C. § 1983 and state tort charges not at issue in this appeal. Court charges were never filed against Cooper as to any of these crimes. Cooper's psychologist, Dr. Todd Flynn, Ph.D. in clinical psychology, testified that Mr. Cooper was traumatized and suffered from post-traumatic stress syndrome as a result of this interrogation.

### B

There was tremendous media attention concerning the Prime Time Rapist in general and the arrest of Cooper in particular. This media coverage included a statement made the evening of May 7, 1986, by Tay-

---

to have them disregarded. As Barkman testified, "I continued the interrogation hoping that it would be at least held voluntary to keep him off the stand and to deprive him of the opportunity of forming an insanity defense.... So those were my motives for violating, trampling on his civil rights, and Miranda's. And the bottom line being, what are his damages. I mean, I'm going to violate this American citizen's rights. But look at the totality of the circumstances, the big picture. Is it worth it? Yeah."

**3.** This officer is not a party to this appeal.

lor, head of the task force, declaring, "what we have caught is a man who has committed two rapes of a series of twenty that we are looking at."

By the morning of May 8, 1986, Gene Scott ("Scott"), the head of the Tucson Police Department Identification Laboratory, realized the latent prints in issue did not belong to Cooper. In the late morning or early afternoon of that day, Ronstadt was told by Captain Leveranz that he did not think Cooper was "good" for the case. Ronstadt was further told that the people who had allegedly seen the Prime Time Rapist did not identify Cooper, and that the police department did not have grounds to charge Cooper with any crime. Ronstadt then met with Scott regarding the fingerprints. During that meeting, Scott explained to Ronstadt that there were "dissimilarities" between the latent prints attributed to the Prime Time Rapist and the known prints of plaintiff Cooper, meaning that the prints did not match. Ronstadt asked Scott why he did not notice the dissimilarities before the arrest. Scott told Ronstadt that he had not done a full comparison prior to the arrest of Cooper and, in particular, had not checked to see if points of dissimilarity existed between the latents and the knowns. When Ronstadt asked Scott why he did not do the things he was supposed to do, Scott replied, "I just screwed up."

Ronstadt decided to meet with the press at 2 p.m. on May 8, 1986, shortly after his meeting with Scott. In this press conference, Ronstadt did not tell the media that the identification personnel did not follow normal procedures in connection with the original fingerprint comparison. Instead, Ronstadt told the press that he had no reason to believe that there was any negligence involved in the fingerprint comparisons or in the arrest of Cooper.

4. These state tort claims include false arrest, malicious prosecution, defamation, false light privacy, intentional infliction of emotional distress, trespass, conversion, negligence, and conspiracy.

5. Though appellants Ronstadt and Wright state in their Notice of Appeal that they were appeal-

The latent fingerprints that had originally been matched to the known prints of Cooper were then shown to the Arizona Department of Public Safety. They told Taylor on May 9, 1986, that the latents had not been made by Cooper. Taylor did not at that time issue a statement to the media clearing Cooper, and no Pima County Sheriff's Department spokesman ever announced to the media that the prints did not belong to Cooper. In July of 1986, two months after the initial arrest of Cooper, a spokesman for the Tucson Police Department finally announced to the media that Cooper had been cleared.

Cooper alleges that subsequent to his release on May 8, 1986, he and his family were evicted from their apartment and he was fired from his job as a result of his arrest and subsequent publicity.

C

Plaintiff filed his Second Amended Complaint on November 25, 1987. This complaint included nine counts under 42 U.S.C. § 1983, and nine counts brought under state tort law. The state tort law claims are not at issue in this appeal.[4]

On October 24, 1988, a hearing took place on motions for summary judgment filed by all defendants in the district court. Appellants Dupnik, Taylor and Barkman were granted summary judgment on all section 1983 counts except for Count One, Denial of Right to Counsel and Right to Remain Silent, and Count Nine, Conspiracy. These appellants now appeal the denial of their defense of qualified immunity in respect to the claim in Count One. Appellants Ronstadt and Wright appeal the denial of their motions for summary judgment based on the qualified immunity defense on Count One, Denial of Right to Counsel and Right to Remain Silent, and Count Five, Injury to Reputation and Property Interests.[5]

ing from the denial of their motion for summary judgment on Count One, Denial of Right to Counsel and Right to Remain Silent; Count Two, False Arrest; Count Three, False Imprisonment; Count Four, Improper Training and Procedures; Count Five, Injury to Reputation and Property Interests; and Count Nine, Conspiracy,

## II

We review a district court's conclusion as to qualified immunity *de novo. Wood v. Ostrander*, 879 F.2d 583, 591 (9th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990). We are determining a question of law: "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions...." *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985).

All appellants contend that the district court erred in denying qualified immunity on Count One of the complaint on the grounds that a policy of ignoring a request for an attorney violates both the Fifth Amendment right against compulsory self-incrimination and the Fourteenth Amendment right to substantive due process. Appellant Tucson Police Department argues that the district court erred in denying qualified immunity on Count Five of the complaint because the law is clearly established that defamation can state a section 1983 claim. Appellants and Appellee request attorney's fees on appeal.

## III

Cooper claims in Count One of his complaint that his Fifth Amendment[6] right against compulsory self-incrimination was violated when the appellants continued to interrogate him despite his invocation of his right to counsel under *Miranda.*[7] Cooper is suing under 42 U.S.C. § 1983[8], which imposes civil liability on a person acting under color of state law[9] who deprives a person of a federal constitutional or statutory right. *Martinez v. California*, 444 U.S. 277, 284, 100 S.Ct. 553, 558, 62 L.Ed.2d 481 (1980); *Wood*, 879 F.2d at 587. Appellants contend that they are entitled to "good faith" or "qualified" immunity, a doctrine that attempts to accommodate the need to protect the rights of citizens through a damage remedy and the need to encourage the vigorous exercise of government authority and to protect such government officials from the fear of being sued in the discharge of those duties. *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). A public official is entitled to immunity from suit as long as his actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Mitchell*, 472 U.S. at 524, 105 S.Ct. at 2814 (quoting *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738).

Cooper contends that his continued interrogation, following his clear and unequivocal request to contact his attorney, is a patent violation of the constitution. He supports this proposition by citing to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). There is language in these cases that appears to support his contention. For example, the *Roberson* Court notes:

> *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964).

---

in their briefs they argue only as to Counts One and Five. Because they do not address Counts Two, Three, Four, or Nine, we will not disturb the district court's findings as to these counts. Further, appellants request in their briefs only that judgment should be reversed as to Counts One and Five.

6. "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V.

7. Cooper has no cognizable Sixth Amendment right to counsel claim because that right does *not attach until an adversary criminal proceeding has been brought against the defendant.*

8. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...." 42 U.S.C. § 1983.

9. It is not disputed on appeal that appellants' actions were a part of their official conduct and that this element of a section 1983 cause of action is satisfied.

[s]urely there is nothing ambiguous about the requirement that after a person in custody has expressed his desire to deal with the police only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

*Roberson*, 486 U.S. at 682, 108 S.Ct. at 2098 (quoting *Edwards v. Arizona*, 451 U.S. at 484–485, 101 S.Ct. at 1884–1885). Likewise the *Miranda* Court noted that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 474, 86 S.Ct. at 1628.

■ A closer inspection of the holdings of these cases as well as later Supreme Court and Ninth Circuit cases interpreting them reveals that a violation of Miranda rights is not itself a violation of the constitution. The actual holdings of the three cases cited by Cooper is simply that statements obtained in violation of the Miranda rule are inadmissible as part of the prosecutor's case-in-chief in a criminal trial against that defendant. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *Edwards*, 451 U.S. at 480, 101 S.Ct. at 1882; *Roberson*, 486 U.S. at 680–81, 108 S.Ct. at 2097–98. The Miranda warnings and rights are not themselves constitutionally mandated, but are rather procedural safeguards, or prophylactic measures, to ensure that the Fifth Amendment right against compulsory incrimination is not violated. *Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987) ("prohibition on further questioning—like other aspects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose ..."); *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2363, 41 L.Ed.2d 182 (1974); *United States v. DeSantis*, 870 F.2d 536 (9th Cir.1989) (because *Miranda* is only a prophylactic rule, statements and evidence

obtained from defendant by the police after he had requested counsel are admissible under the public safety exception to *Miranda*); *Smith v. Endell*, 860 F.2d 1528, 1532 (9th Cir.1988) ("The conduct it [*Edwards*] prohibits is not wrongful in itself. The purpose of the rule is wholly prophylactic ...").

For this reason, the Court has allowed the use of statements taken in violation of Miranda requirements in a variety of ways. For example, evidence obtained from a defendant in violation of Miranda requirements may be admissible under the public safety exception (*New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)), and a statement taken by police who questioned a suspect after he asked for an attorney can be used at a criminal trial for impeachment purposes (*Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975)).

■ Although there is no case on point from our circuit, all out-of-circuit cases hold that a plaintiff may not, as a matter of law, maintain a section 1983 action based upon the failure by the police to issue Miranda warnings. *Bennett v. Passic*, 545 F.2d 1260, 1263 (10th Cir.1976) ("The *Miranda* decision does not even suggest that police officers who fail to advise an arrested person of his rights are subject to civil liability; it requires, at most, only that any confession made in the absence of such advice of rights be excluded from evidence."); *Thornton v. Buchmann*, 392 F.2d 870 (7th Cir.1968); *Hampton v. Gilmore*, 60 F.R.D. 71 (E.D.Mo.), *aff'd* 486 F.2d 1407 (8th Cir.1973); *Williams v. Tansey*, 610 F.Supp. 1083, 1085 (E.D.Pa.1985); *Turner v. Lynch*, 534 F.Supp. 686, 689 (S.D.N.Y.1982). These cases are not precisely on point, since in the instant case the police gave the Miranda warnings but refused to allow Cooper to exercise his rights. But the reasoning of these cases does apply—since Miranda requirements are not a constitutional prerequisite, their violation cannot form the basis of a section 1983 suit.[10]

---

**10.** One district court case has involved a situation where police officers continued to question

the defendant after he requested counsel, and held that there could be no section 1983 liability

■ Cooper can cite to no case allowing a section 1983 suit under the circumstances of his case. Where the confession is not extrinsically involuntary,[11] but merely in violation of Miranda requirements, there can be no Fifth Amendment violation, if at all, until such confession is introduced against the defendant in a criminal trial.[12] Because it was not a Fifth Amendment violation to refuse to honor Cooper's invocation of his Miranda rights, Cooper cannot bring a 42 U.S.C. § 1983 action on this ground.[13]

The district judge correctly noted that continued interrogation after a defendant invokes his Miranda right to counsel does not violate the Fifth Amendment. However, the judge went on to hold that appellants receive no qualified immunity because he "find[s] it to be somewhat different when you have a pattern of activity that is at least known to the upper officials of the Department who then do nothing to stop it."[14] We see little logic in this position. If the conduct of the individual officers is not a constitutional violation, then the fact that the two law enforcement departments condoned such conduct cannot turn it into one.

On the other hand, the district judge is rightfully disturbed that a police department can choose to dispense with Miranda warnings at will.[15] As the trial judge incredulously exclaimed,

> I kind of get the feeling that what you are really telling me then is, it's okay not to pay any attention to *Miranda* because the only thing that can happen to you if you do it is that, if you go to trial you can't use what you've got out of them, but if we violate *Miranda* just as much as we want to, it's tough luck. We can

---

under those circumstances. *Chrisco v. Shafran*, 507 F.Supp. 1312, 1320–21 (D.Del.1981) ("To the extent that *Miranda v. Arizona*, supra, recognizes a right to counsel during custodial interrogation it is because the presence of counsel is 'the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege. This presence would insure that statements made in the government-established atmosphere are not the product of compulsion.' 384 U.S. at 466, 86 S.Ct. at 1623. Thus, the right to presence of counsel, just like the right to pre-interrogation warnings, is not a constitutional right, but a procedural safeguard which protects the constitutional right to be free from compelled self-incrimination. For the same reasons that there is no action for damages for failure to advise of *Miranda* warnings, there can be no civil action for denying access to counsel during custodial interrogation.")

11. If the statements were actually involuntary, as a result of physical or psychological coercion by the police, this would be a violation of the due process clause of the Fourteenth Amendment. See section IV of this opinion for a discussion of this issue.

12. This is in sharp contrast to Fourth Amendment, Sixth Amendment, and Due Process violations, where the constitution is violated as soon as the defendant is unreasonably searched, denied an attorney after indictment, or coerced by police into confessing. Thus, in those latter cases the former defendant can bring a section 1983 action even if he is never taken to court on a criminal charge.

13. We note that this argument may be more properly characterized as a motion to dismiss under Fed.R.Civ.P. 12(b)(6). Without a constitutional violation on the part of the appellants, Cooper has failed to state a claim under 42 U.S.C. § 1983.

14. Perhaps the district judge was confused by a line of cases holding that a policy of failing to train police officers can be the basis of municipal liability under section 1983, although this policy itself is not unconstitutional. However, these cases hold that the municipality (as opposed to the individual actor) can be held liable under section 1983 for failing adequately to train their police officers only if the city's failure to train represented a deliberate indifference to the constitutional rights of its inhabitants, and those untrained officers actually violated plaintiff's constitutional rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–92, 109 S.Ct. 1197, 1204–07, 103 L.Ed.2d 412 (1989); *Merritt v. County of Los Angeles*, 875 F.2d 765, 769 (9th Cir.1989). In the instant case, the individual officer did not violate the Fifth Amendment by failing to honor Cooper's Miranda rights. Therefore, there would be no constitutional violation by the individual officer upon which to base liability of the city or county.

15. After all, the Supreme Court has decided that the Miranda warnings are a necessary prophylactic to assure compliance with the Fifth Amendment. Although the only remedy under the case law is suppression of evidence, the Court probably did not intend to leave it to police discretion when to honor *Miranda* and when the price is too high.

arrest people and we can hold them for two or three days, we can do all of those kind of things, strip-search them, put them in the drunk tank and all of that business, and it's okay, we walk away, because the only penalty for violation their rights is to quash the testimony at the time of trial. Is that the County's position?

Such a parade of horribles is not entirely accurate. This conduct could lead to section 1983 actions on the basis of an unreasonable search, false arrest, due process violation, and of course, independent state law claims. Further, the state officials may be deterred by the remedy in *Miranda* itself, the suppression of the evidence. It appears to us that if there is to be any harsher penalty imposed for a simple violation of Miranda rights, we will have to wait for word from Congress or the Supreme Court.

## IV

■ Cooper also alleges in Count One of his complaint that his interrogation "was coercive and involved the use of interrogation techniques which were intended to, and did, cause the Plaintiff to suffer great emotional stress and mental anguish, and to induce in the Plaintiff a sense of hopelessness." He further alleges that this deprived him of rights secured by the "Fourteenth Amendment to the Constitution of the United States."[16] The district court judge interpreted this section of Count One

as stating a claim for a violation of Cooper's substantive due process rights under the Fourteenth Amendment.

■ If actual physical or psychological coercion overcomes the defendant's will, leading to an involuntary confession, this is a due process violation. *Haynes v. State of Washington*, 373 U.S. 503, 513, 83 S.Ct. 1336, 1342, 10 L.Ed.2d 513 (1963); *Brown v. State of Mississippi*, 297 U.S. 278, 286, 56 S.Ct. 461, 465, 80 L.Ed. 682 (1936).[17] There is an insurmountable problem in finding a due process violation necessary to support a section 1983 claim in this case using this theory, however, because Cooper, an innocent man, was never coerced into a confession. Here the claim is not that police action produced an involuntary confession, but that the police action itself was in violation of the 14th Amendment. It is true that the cases involving involuntary confessions recognized that the police actions, not just the resulting confessions, were a wrong. *See Brown v. Mississippi*, 297 U.S. 278, 286, 56 S.Ct. 461, 465, 80 L.Ed. 682 (1936) (Not only was the coerced confession inadmissible, but it "would be difficult to conceive of methods more revolting to the sense of justice.") Nevertheless, where the defendant's will has not been overcome, we hesitate to rely on cases declaring police action to be unconstitutional because the action resulted in an involuntary confession. There is scant authority to support a finding that attempted coercion is itself a due process violation.[18]

---

16. "... [N]or shall any State deprive any person of life, liberty, or property, without due process of law...." U.S. Const., amend. XIV, § 1.

17. Confessions that are actually coerced by overbearing a defendant's will, rather than by merely violating his Miranda rights, are analyzed under the due process clause of the Fourteenth Amendment and not the Fifth Amendment clause against self-incrimination. This is merely a historical accident. The Supreme Court began analyzing coerced confessions under due process before the Fifth Amendment privilege against forced self-incrimination was applied to the states through the Fourteenth Amendment in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Soon after the Fifth Amendment was incorporated into the Fourteenth, the Court decided the *Miranda* case in 1964. Since then, the Court has used the

Miranda warnings and presumption of coercion to deal with Fifth Amendment self-incrimination violations, and has continued to use the due process clause to deal with confessions that were actually involuntary. Thus, we will place Cooper's claim that his confession was involuntary under the due process clause, as did the district court judge.

18. 55 A.L.R.2d 512, finds "[c]ivil liability, under federal civil rights statute (42 U.S.C. § 1983) of state officers who coerce or *attempt* to coerce confession or pleas of guilty." (emphasis added). However, none of the cases discussed there hold that an unsuccessful attempt to coerce a confession standing alone is sufficient to state a claim under section 1983. *Refoule v. Ellis*, 74 F.Supp. 336, 339 (N.D.Ga.1947) did hold that allegations of an attempt to coerce a confession by prolonged questioning in relays and infliction of

In certain cases, however, police conduct is sufficiently reprehensible that it violates substantive due process. The Supreme Court first enunciated the standards for determining when the administration of criminal justice goes beyond the pale in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). There, the Court saw its task to ascertain whether the actions of the police "offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." *Id.* 342 U.S. at 169, 72 S.Ct. at 208 (quoting *Malinski v. New York*, 324 U.S. 401, 416–17, 65 S.Ct. 781, 788–89, 89 L.Ed. 1029 (1945)).

The relevant inquiry in distinguishing simple tort actions from substantive due process violations is "whether the deprivation is sufficiently serious that 'the constitutional line has been crossed.'" *Wood*, 879 F.2d at 589.[19] This quote provides little guidance as to when police conduct reaches this level of seriousness.[20] We have found substantive due process violated and allowed section 1983 claims on this basis in the instance of serious police brutality, *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1447–48 (9th Cir.1986) (citizen's allegations that police officers, without provocation and without placing him under arrest, detained him, threw him on the ground, and punched and kicked him, properly constituted a section 1983 claim for deprivation of substantive due process), and where the police affirmatively assumed a duty toward a citizen by placing her in a position of danger and then acted with deliberate indifference toward her welfare, *Wood*, 879 F.2d at 588 (police arrested driver of car, thereby stranding the plaintiff-passenger in a dangerous neighborhood at night where she was subsequently raped).

We must decide whether, assuming the facts are as Cooper has alleged, a substantive due process violation occurred. Cooper has alleged, in essence, that he was interrogated for four hours, that the police officers used psychological pressure to attempt to coerce him into confessing, that his numerous requests to see an attorney were denied, that he was angry and upset, that he was questioned regarding his religious beliefs, that he had a psychological condition which made him particularly susceptible to stress from interrogation, and that he was held incommunicado for twenty-four hours before finally being released.

Though the question is a close one, we decline to hold that this conduct is a violation of substantive due process. While such conduct is to be condemned, the actions taken by appellants in ignoring *Miranda*'s prophylactic rule were not suffi-

---

violence on the person of plaintiff stated a claim for violation of due process (thus defendants' motion to dismiss plaintiff's civil rights suit under 8 U.S.C. § 43 was denied), but those actions stated a claim only in conjunction with personal restraint and confinement of plaintiff by police without a warrant or probable cause to arrest, and plaintiff did end up making inculpatory statements. *See also Robichaud v. Ronan*, 351 F.2d 533 (9th Cir.1965) (juvenile plaintiff stated claim under section 1983 by alleging that defendants arrested and charged her without probable cause, in violation of the Fourth Amendment, and unsuccessfully attempted to intimidate plaintiff into confessing to crimes of which she was innocent, with intent of depriving her of right to counsel and inflicting mental and physical damage, in violation of Sixth and Fourteenth Amendments); *Geach v. Moynahan*, 207 F.2d 714, 717 (7th Cir.1953) (where defendant police illegally seized and searched plaintiff, on three separate occasions, and subjected him to hours of brutal interrogation in an attempt to coerce a confession, refused him the right to contact any counsel or relatives, refused

to charge him with a crime or take him before a judge, and held him for six days, he had alleged a claim under section 1983); *but cf. Link v. Greyhound Corp.*, 288 F.Supp. 898, 900 (E.D. Mich.1968) (plaintiff failed to state claim under section 1983 where defendants had probable cause to arrest and despite attempt by prosecutor to coerce plaintiff into pleading guilty he did not in fact plead guilty and was afforded a fair trial).

19. We do not view the instant case as a fourth amendment claim for excessive police force, as little physical force was employed against Cooper in his arrest. *See Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989). However, our conclusion would be the same under a fourth amendment reasonableness analysis.

20. *See also Rochin*, 342 U.S. at 172, 72 S.Ct. at 209, where the Court concluded that conduct which "shocks the conscious" of the court would constitute a violation of substantive due process.

ciently serious to rise to the level of a due process violation.[21]

■ Even if we were inclined to find that if Cooper's allegations are true and his substantive due process rights were violated, appellants should still receive qualified immunity in this case, as there are no cases in this or any other circuit that would have put a reasonable public official on notice that appellants' conduct violated clearly established law. There are simply no section 1983 substantive due process cases with similar facts. *See Myers v. Morris,* 810 F.2d 1437, 1460 (8th Cir.) ("[A] reasonable person is not expected to act as a legal scholar and predict the future direction of the law. Closely analogous cases, decided before the defendant acted ... are often required to find that a constitutional or statutory right is clearly established."), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987).

## V

■ Pima County Sheriff's Department appellants contend that Dupnik is entitled to qualified immunity as to the substantive due process theory under Count One of the complaint. They note that while there is some evidence that Sheriff Dupnik knew of the plan to persist in questioning the Prime Time Rapist suspect if a lawyer was requested, this goes only to his qualified immunity as to the Fifth Amendment issue in Count One. As to Cooper's Fourteenth Amendment claim that the character of his interrogation violated substantive due process, Dupnik claims immunity because he neither knew of nor participated in the choice of tactics used in the actual interrogation.

In support of this proposition, Dupnik cites cases which hold that a superior is not liable for the actions of an inferior of which he is unaware. *Triplett v. Azordegan,* 570 F.2d 819, 823 (8th Cir.1978) (defendant is not liable under section 1983 unless he was personally involved in causing the depriva-

tion of a constitutional right or he is charged with having actual knowledge that his subordinates are causing the deprivation of constitutional rights); *Harris v. Pirch,* 677 F.2d 681 (8th Cir.1982) (sheriff can have no liability under section 1983, where court found that he had no knowledge or involvement in actions by deputy, and was in fact out of town when the events transpired).

In the instant case, Sheriff Dupnik was informed of the interrogation plan, and condoned it. If Cooper does have a substantive due process claim based upon the interrogation, this act of continuing to question for hours despite Cooper's pleas for an attorney is a large factor in it. Thus the fact that Dupnik may not have know the precise details of the interrogation does not preclude his liability. *Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir.1977) (section 1983 liability must be read against the background of tort liability that makes a man responsible for the natural consequences of his actions, though the doctrine of respondeat superior has no application); *Coyne v. Boeckmann,* 511 F.Supp. 667, 670 (E.D.Wis.1981) (allegation that sheriff consented to or afterward approved acts of subordinates in obtaining involuntary confession from plaintiff was sufficient to state a section 1983 claim against him). Thus the district court was correct in holding Dupnik liable on the substantive due process claim of Count One to the same extent as the other appellants. However, because we find that all appellants are entitled to qualified immunity on this count, Dupnik is shielded as well.

## VI

Cooper alleges in Count Five of his amended complaint that the Tucson Police Department appellants made defamatory statements regarding Cooper to the press which resulted in Cooper being fired from his job and evicted from his residence, in addition to suffering serious injury to his

---

21. If we were to find otherwise, we would place ourselves in the anomalous position of on the one hand following Supreme Court precedent and finding that a violation of *Miranda* is not a violation of the Fifth Amendment, while on the other hand finding that this same conduct shocks our conscience and is therefore a violation of the Fourteenth Amendment.

business and personal reputation. Cooper contends this is a deprivation of his due process rights as secured by the Fourteenth Amendment, and thus states a cause of action under section 1983. Appellant Ronstadt appeals the district court's denial of his motion for summary judgment on the grounds of qualified immunity as to this count.

■ In *Paul v. Davis*, 424 U.S. 693, 703, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976), the Court held that injury to reputation is not a liberty or property interest protected by the due process clause of the Fourteenth Amendment, and therefore this injury alone does not present an actionable claim under section 1983. This is because "[t]he Due Process Clause does not, by its own force, extend individuals a right to be free of injury wherever a state is characterized as the tortfeasor. The Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States.'" *Johnson v. Barker*, 799 F.2d 1396, 1399 (9th Cir.1986) (quoting *Paul*, 424 U.S. at 701, 96 S.Ct. at 1160). To state a claim for defamation under section 1983, a plaintiff must allege loss of a recognizable property or liberty interest in conjunction with the allegation of injury to reputation. *Vanelli v. Reynolds School District No. 7*, 667 F.2d 773, 777–78 (9th Cir.1982) (the procedural protections of due process apply if the accuracy of a charge impairing a citizen's reputation for honesty or morality is contested, there is public disclosure of the charge, and it is made in connection with the alteration of some right or status recognized by state law). This has become known as the "stigma-plus" test.[22]

The *Stevens* court noted two ways to meet the stigma-plus test. One way is to allege that the injury to reputation caused the denial of a federally protected right. *Stevens v. Rifkin*, 608 F.Supp. 710, 726–27 (N.D.Cal.1984) (where plaintiffs alleged that prosecutor disseminated accusations to

the press in an attempt to deprive plaintiff of his Sixth Amendment right to an impartial jury panel, this stated a claim for relief under section 1983). *See also Wisconsin v. Constantineau*, 400 U.S. 433, 434 n. 2, 437, 91 S.Ct. 507, 508 n. 2, 510, 27 L.Ed.2d 515 (1971) (plaintiff stated cause of action under section 1983 for due process violation where defamatory act of posting an individual's name as having an excessive drinking problem without prior hearing resulted in the deprivation to that individual of the right previously held under state law to purchase or obtain liquor); *Marrero v. City of Hialeah*, 625 F.2d 499, 517 (5th Cir.1980) (court held plaintiff stated a due process violation under section 1983 where the alleged defamation by the public official caused plaintiff to lose business goodwill, a protected property interest in Florida), *cert. denied, Rashkind v. Marrero*, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981).

■ A second basis for finding an actionable claim under section 1983 is where the plaintiff alleges the injury to reputation was inflicted in connection with a federally protected right. *Stevens*, 608 F.Supp. at 727 (court held plaintiffs stated proper claim under section 1983 where defamatory statements were made in connection with alleged unconstitutional arrest and prosecution). *See also Gobel v. Maricopa County*, 867 F.2d 1201, 1205 (9th Cir.1989) (plaintiffs properly alleged the kind of "defamation plus" injury necessary to state a section 1983 claim where they alleged that the false statements were made in connection with their illegal arrest); *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) (defamation in the course of termination of public employment by the state sufficient to state cause of action under section 1983).

### A

■ Cooper's first theory is that the defamation by Ronstadt caused him to lose his employment and residence, both of

---

**22.** The "plus" part of this test can be met by either the denial of a right specifically secured by the Bill of Rights (such as the right to free speech or counsel), or the denial of a state-created property or liberty interest such that the Fourteenth Amendment's Due Process Clause is violated.

which he alleges are protected property interests under the law of the state of Arizona.[23] Cooper relies on *Marrero*, where the court held that the plaintiff stated a cause of action under section 1983 for a due process violation where government officials defamed the plaintiff, resulting in a loss of business goodwill. Business goodwill is a property interest under Florida law. That court noted that "[t]he fact that the injury to the 'plus' here, i.e., to appellants' protected interest in goodwill, depends upon the reactions of third parties to the defamatory statements made by the government is immaterial." 625 F.2d at 516, n. 23. Thus the statements made by the public officials in *Marrero* injured a constitutionally protected property interest of the plaintiff, and this, the *Marrero* court concluded, satisfied the "stigma plus" test of *Davis*.

Cooper argues that his employment and residence are both legally protected under Arizona law.[24] Thus, like the plaintiff in *Marrero*, Cooper suffered both the loss of legally protected interests plus injury to his reputation due to appellants' defamatory remarks, and should therefore be allowed a section 1983 action. Ronstadt, on the other hand, argues that even if Cooper's job and apartment are protected property interests under Arizona law, the taking of these by third parties does not satisfy the stigma-plus test. Ronstadt cites a number of cases which hold contrary to *Marrero*, and one which specifically disapproves of it.

In *Sullivan v. State of New Jersey*, 602 F.Supp. 1216, 1222 (D.N.J.1985), *aff'd* 853 F.2d 921 (3d Cir.1988) the district court quoted note 23 in *Marrero* (cited above) and stated its disagreement "that the logic of *Paul* leads to such a conclusion." In *Sullivan*, the plaintiff argued that the defamation by the government officials caused them to lose protected rights in contractual relations with third persons. The court found that this did not satisfy the stigma-plus test, because the state action did not directly affect the plaintiff's rights or status under the law.

> In short, a *sine qua non* of a "stigma-plus" suit is that the 'plus' must be the result of state action directly affecting the plaintiff's rights or status under the law.

. . . . .

If a state recognizes reputation as a liberty interest or property right, then the

---

**23.** Whether a person has a property interests such that it is possible for a state to deprive him of life, liberty, or property, without due process of law is determined by reference to state law. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

**24.** We believe Cooper is mistaken in his assertion that a citizen's employment and rented residence are designated "property" by Arizona law. He states that they are "legally protected under Arizona law." Here he appears to be confusing a property interest with a cause of action in tort. Where a person suffers a legally cognizable wrong, such as being defamed or having a business advantage interfered with, he is "legally protected" in the sense that he can sue in tort, regardless of whether the state has defined his reputation or business relationship as property. Likewise, a citizen in Arizona can sue for wrongful termination without having a property interest in his employment and can refuse to leave a residence if evicted without proper notice without having a property interest in his unowned apartment. The authorities cited by Cooper do not state that Arizona has turned at-will employment not pursuant to contract or rented housing into property interests. *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 710 P.2d 1025, 1036 (1985) simply gives a

citizen the right to sue for wrongful discharge in an at-will employment situation where the termination is for bad cause—defined as against public policy as articulated by constitutional, statutory or decisional law. A.R.S. § 33–1375(B) merely states that a landlord may terminate a month-to-month tenancy by a written notice given 30–days in advance.

Thus even under *Marrero*, Cooper probably has no property interest to be deprived of, and thus fails to meet the stigma-plus test necessary to state a section 1983 claim. *See Chaudhry v. Prince George's County, Md.*, 626 F.Supp. 448 (D.Md.1985), where plaintiff alleged that because of the defamation, he suffered a decrease in the number of his patients, and that this was sufficient to satisfy the stigma-plus test and allow him to bring a section 1983 action. The court rejected this claim, finding that "[p]laintiff's contention that he has lost income because of a decrease in the number of patient referrals is no more than a claim for consequential damages resulting from an injury to his reputation. Plaintiff has not alleged and cannot allege on this record that any decrease in referrals was caused by the loss or alteration of a legal status recognized and protected by state law." *Id.* at 454.

very act of defamation itself infringes on the right and is actionable under § 1983 if performed under color of state law.... In the present case, there has been no contention that reputation in itself has the status of a property right or liberty interest.... Where state law does not accord property right/liberty interest status to reputation, for a court to require a showing of state action only as to the "stigma" portion of the "stigma-plus" test would be to do away with the latter prong of the test. If plaintiff only has to show that the state defamed him—and not that the state did something else as well—in order to state a claim for deprivation of liberty under § 1983, the effect would be to transmute all defamation actions against state actors in which plaintiff can show some harm resulting from the defamation into § 1983 actions. This is clearly in conflict with the intent of *Paul,* which explicitly warns against turning the Fourteenth Amendment and § 1983 into a "font of tort law to be superimposed upon whatever systems may already be administered by the States."

*Sullivan,* 602 F.Supp. at 1222–23 (citation omitted).

Likewise, in *Green v. DeCamp,* 612 F.2d 368, 370, 371 (8th Cir.1980) the court ruled that collateral consequences of the defamation, such as loss of business, public scorn, and potential loss of employment, did not create a cause of action for the defamation under *Paul,* since such consequences would not be the result of any affirmative conduct by the parties making the defamation.[25]

It seems to us that the result in *Sullivan* makes better law and is truer to *Paul* than the result in *Marrero.* However, regardless of which way we come out on this issue, Ronstadt does not lose his qualified immunity because his statement regarding Cooper, even if defamatory, did not violate clearly established federal statutory or constitutional rights. The contradictory conclusions of *Green, Chaudhry,* and *Sullivan,* the latter of which acknowledges its conflict with *Marrero,* destroy any inference that *Marrero* constitutes clearly established law.

**B**

Cooper's second theory of liability under the stigma-plus test is that Ronstadt's statements were intertwined with his arrest of Cooper, and this unconstitutional arrest (in violation of the Fourth Amendment) constitutes the necessary plus of the stigma-plus requirement.[26] Cooper argues that under *Stevens* and *Marrero,* the law was clearly established on this point as of May 8, 1986, and thus Ronstadt forfeits his qualified immunity. The case law as of that date does support his position.[27] *Marrero,* 625 F.2d at 519 (court held that the defamatory statements were actionable under section 1983 because the public "surely perceived the defamatory statements made ... to be connected to the arrests and search and seizure"); *Stevens,* 608 F.Supp. at 727–28 (where plaintiffs alleged that defamatory statements by police

**25.** *Green* can be contrasted to *Vanelli,* 667 F.2d 773 (public disclosure of charge of immoral conduct did create cause of action under section 1983 when coupled with state's dismissal of public high school teacher without pre-termination hearing). There the court held that under Oregon law, one has a property interest in continued employment when dismissed during the middle of a one-year contract and in breach of it's provisions. Thus the state, in firing the plaintiff without a hearing, violated his property interest without due process of law. Even if Cooper does have a property interest in not being fired under Arizona law, only a government actor may violate the Fourteenth Amendment and appellants did not fire Cooper.

**26.** Cooper's section 1983 claim of false arrest in Count Two of his complaint survived a summary judgment motion as to appellant Ronstadt, and this order was not appealed.

**27.** The case law since that date continues to support Cooper. *See Gobel v. Maricopa County,* 867 F.2d 1201, 1205 (9th Cir.1989) (plaintiff stated claim under section 1983 where officers made defamatory statements in connection with their unlawful arrest and seizure without giving him notice and an opportunity to be heard); *Johnson v. Barker,* 799 F.2d 1396, 1399 (9th Cir.1986) (alleged defamation did not state section 1983 claim because though plaintiffs asserted reputation injury and false arrest, court determined that plaintiffs were never arrested).

captain were made in connection with their unconstitutional arrests and prosecutions, the injury to plaintiffs' reputations constituted "deprivation of liberty interests," and was thus actionable under section 1983).

■ Appellants admit that "*Marrero* does set forth law which, when applied to the facts of the case at bar, would allow Cooper to recover general damages for diminished reputation." [28] Ronstadt's response to this is first that this argument is not alleged in appellee's Second Amended Complaint, and second that the case law did not give a reasonable official in Ronstadt's position notice of clearly established law. Both of these arguments lack merit. Ronstadt points out the absence of any allegation in Count Five of the Second Amended Complaint that the defamatory statements were "following and inexorably linked to the unlawful, warrantless arrest." [29] He claims that Cooper made a decision in his Second Amended Complaint to use his loss of employment and residence as the "plus" component of the stigma-plus test, instead of using his arrest. He thus concludes that it would be unfair to the appellants, after discovery has already been conducted, to allow Cooper to make the latter claim. It is true that Cooper does not specifically mention that the alleged defamatory statements were made in connection with his arrest, and does specifically note that the defamation constituted a deprivation of his property interest in his continued employment. However, in the first paragraph of Count Five Cooper realleges paragraphs 1 through 43, which includes his Count Two claim of false arrest, and in the final paragraph alleges that the defamatory statements violated his rights as secured by the Fourteenth Amendment.

In *Stevens*, the plaintiff alleged merely that the defendants' defamatory statements violated their Fourteenth Amendment right not to be deprived of liberty without due process of law, not that the conduct of defendants violated their Sixth Amendment right to a fair and impartial trial. Nevertheless, the district judge held that they stated a claim under section 1983 for defamation in connection with a violation of the Sixth and Fourteenth Amendments, because of the factual allegations in the complaint that the defendants made the statements knowing that if they were broadcast they would be heard by potential and actual witnesses, jurors, and judges. *Stevens*, 608 F.Supp. at 727. In the case at bar it is very clear from the facts, as stated in the Second Amended Complaint, that Ronstadt made his statement in connection with Cooper's arrest and release (it directly referred to this arrest). Given that appellants knew these facts, it is hard to imagine what further discovery they would now undertake, or why they wouldn't have already done it (since the law on this point— that defamation in connection with the violation of a constitutional right states a claim under section 1983—was clear).

■ Under federal notice pleading, appellees are entitled to vary their theory to conform to proof presented. *Johnson v. Barker*, 799 F.2d 1396, 1401 (9th Cir.1986) (appellants provided no basis upon which to vary theory from negligent failure to rescue to false imprisonment). Since proof of false arrest and defamation have been proffered by the appellee, Cooper should be permitted to argue this theory of liability even if appellant is correct that Cooper is changing his theory of liability from defamation plus employment loss to defamation plus false imprisonment.

■ Ronstadt next contends that even though it may be true that Cooper's claim of defamation in connection with false arrest states a claim under section 1983, this was not clear to a reasonable official at the time Ronstadt made the statement at issue. He argues that *Marrero* and *Stevens* failed

---

**28.** Appellants claim here that even under this analysis, however, Cooper would not be allowed recovery from Ronstadt of damages for loss of employment and residence, since those were taken by third parties and not by Ronstadt. We believe he is mistaken, but in any event these are issues of proximate causation and damages,

to be decided by a jury at trial and not by this court.

**29.** He notes that this language was present in Cooper's First Amended Complaint, which was dismissed without prejudice in September, 1987.

to give him notice of clearly established law because of its alleged conflict with *Paul,* the seminal Supreme Court case in this area. He quotes the section of *Paul* which holds that:

> [i]f respondent's view is to prevail, a person arrested by law enforcement officers who announce that they believe such person to be responsible for a particular crime in order to calm the fears of an aroused populace, presumably obtains a claim against such officers under § 1983....
>
> It is hard to perceive any logical stopping place to such a line of reasoning. Respondent's construction would seem almost necessarily to result in every legally cognizable injury which may have been inflicted by a state official acting under "color of law" establishing a violation of the Fourteenth Amendment.

*Paul,* 424 U.S. at 698–99, 96 S.Ct. at 1159–60.[30]

Far from conflicting with the "stigma-plus" test set out in *Marrero* and *Stevens,* the above quote explains why such a test is necessary. *Paul* goes on to hold that because of the above problem (of turning every state tort into a section 1983 claim), defamation is not actionable under section 1983 unless coupled with the denial of one of the provisions of the Bill of Rights or the extinguishment of a right previously recognized by state law. *Paul,* 424 U.S. at 710–11, 96 S.Ct. at 1164–65. Thus it should have been clear to a reasonable public official at the time of *Paul* (1975), and certainly by the time of *Marrero* (1980) and *Stevens* (1984) that Cooper's claim was actionable.

Ronstadt's final arguments here are that he had no choice but to address the media following Cooper's release, and that his statements did not brand Cooper as the Prime Time Rapist. These arguments are irrelevant to his claim of qualified immunity. Initially, we do not see why Ronstadt was compelled to make a statement to the media, rather than making no comment at all or making a nondefamatory one. Secondly, his argument that his statement was innocuous goes to the merits of Cooper's claim (whether the statement was defamatory), which should not be decided on this appeal. Finally, part of the alleged due process violation perpetrated by Ronstadt was the false arrest: had Cooper not been illegally arrested, the defamatory statements would not have been made. So even if true that Ronstadt had to say something, he put himself in this position by his own allegedly wrongful conduct.

## C

 Cooper suggests a third basis of section 1983 liability—that Ronstadt's statements violated clearly established state law (since defamation is actionable under Arizona tort law) and that therefore Ronstadt loses his qualified immunity. This argument is completely meritless. Ronstadt correctly points out that a state official is not liable for a federal civil rights claim under section 1983 for violating state law, unless the conduct deprives the plaintiff of a right to which due process guarantees apply. As previously quoted from *Paul,* injury to reputation alone does not deprive a person of liberty within the meaning of the Fourteenth Amendment.

> Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a result of petitioners' actions. Rather his interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions.

*Paul,* 424 U.S. at 711–12, 96 S.Ct. at 1165–66. Arizona law provides Cooper with the opportunity to obtain damages under the theory of a state tort action (as argued in Count Twelve of Cooper's Second Amended Complaint).

---

**30.** The alleged defamatory statement made by Ronstadt, which allegedly implies that Cooper may be the rapist but is being released anyway, cannot in good faith be claimed to have been made to calm the fears of the populace in any case.

## VII

 Appellants Dupnik, Taylor and Barkman request that attorneys' fees be given them for the prosecution of this appeal, pursuant to 42 U.S.C. § 1988.[31] Since the Pima County Sheriff's Department appellants are the prevailing parties, they are entitled, at our discretion, to attorneys' fees under 42 U.S.C. § 1988. *Sotomura v. County of Hawaii*, 679 F.2d 152 (9th Cir. 1982) (attorneys fees may be awarded at the appellate as well as the trial level). However, successful defendants in civil rights cases are allowed to recover attorneys' fees only upon a finding that plaintiff's action was frivolous, unreasonable, or without foundation. *Christiansburg Garment Company v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978); *Patton v. County of Kings*, 857 F.2d 1379, 1381 (9th Cir.1988) (prevailing section 1983 civil rights defendant is entitled to attorney fees only where action brought is found to be unreasonable, frivolous, meritless, or vexatious); *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 647–48 (9th Cir.) (defendants not entitled to attorney's fees on appeal from Indian tribe's claim for unlawful trespass because plaintiffs raised issues not previously addressed by courts and their case could not be characterized as frivolous or unreasonable), *cert. denied* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 705 (1986).

 With this standard in mind, and on the record in this case, appellants are not entitled to attorneys' fees. Far from being frivolous, Cooper's claims are both novel and substantial.

 The appellee also requests attorney's fees on appeal. Cooper is not the prevailing party on Count One as to all appellants, and is thus not entitled to attorney's fees on this issue. However, Cooper is the prevailing party as to appellant Ronstadt on Count Five, and is awarded attorney's fees on that issue. The purpose of the Civil Rights Attorneys Fees Award Act is to encourage meritorious civil rights litigation by allowing prevailing plaintiffs to obtain attorney's fees in all but special circumstances. *See Bittner v. Sadoff & Rudoy Industries*, 728 F.2d 820, 829 (7th Cir.1984); *Christiansburg*, 434 U.S. at 417, 98 S.Ct. at 698. No special circumstances apply in this case.[32] Cooper's attorney is to provide the district court with documentation of expenses associated with the defamation issue of this appeal, to assist it in determining a reasonable award.

## VIII

We reverse the district court's denial of qualified immunity to all appellants as to Count One of the complaint. We disagree with the district court's conclusion that the continued interrogation violated the Fifth Amendment simply because it violated *Miranda* and the law enforcement agencies condoned the conduct. We also reverse the denial of qualified immunity to all appellants on this same count on the ground of substantive due process. We affirm the district court's denial of qualified immunity to the Tucson Police Department appellants on Count Five, since the alleged defamation was in connection with an alleged unconstitutional arrest.

Attorney's fees are granted to plaintiff as to Count Five. Appellants will receive no fees.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR DETERMINATION OF FEES.**

NOONAN, Circuit Judge, concurring and dissenting:

Michael Cooper was held by members of the Pima County Sheriff's Department and

---

31. Appellants Ronstadt and Wright make no such request.

32. For examples of special circumstances, see *Robins v. Harum*, 773 F.2d 1004, 1011 (9th Cir. 1985) (prevailing plaintiffs denied attorney's fees on appeal because counsel failed to provide court with analysis of governing case law, requiring court to engage in independent research); *Greenside v. Ariyoshi*, 526 F.Supp. 1194 (D. Hawaii 1981) (no attorney's fees to plaintiff where it was unnecessary to file civil rights action because settlement could have been achieved, state had voluntarily suspended enforcement of statute, and legislative session that removed offending language had commenced).

the Tucson Police Department and interrogated as to his responsibility for a series of notorious rapes. He was lyingly informed that his prints had been found at the scene of one of the rapes, and he was inaccurately told that his prints matched those found in two of the other rapes. He was told that he was Jewish and it was suggested that as a Jew he must be a prey to guilt. He asked for counsel and, pursuant to a police plan already devised, he was denied counsel. The interrogation began at 3:00 P.M., and, with a break to transport him from one point of custody to another, lasted till 7:30 P.M. The purpose of the interrogation was to create a sense of hopelessness in Cooper, leading him to confess guilt of the rapes. The interrogation in fact created stress in Cooper, resulting in his becoming anxious, angry, and upset and in his crying and sobbing. He never confessed because he had nothing to confess. The experience of interrogation has left him with memories and reactions that constitute a syndrome of post-trauma stress.

Addressing his claim of injury in Count 1, the court begins to analyze it as though it were for violation of Cooper's rights under *Miranda*. Count 1, ¶ 23 of Cooper's Second Amended Complaint alleges: "This intentional and willful conduct of the Defendants deprived Mr. Cooper of the rights secured by the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States." What Cooper has sought damages for is the violation of substantive rights, not the violation of the procedural safeguards provided by *Miranda*.

The court, when eventually it does address Cooper's due process claim, declares: "There is an insurmountable problem in finding a due process violation necessary to support a section 1983 claim in this case using this theory, however, because Cooper, an innocent man, was never coerced into a confession." The position of the court is that if unlawful police interrogation overcomes the will of a guilty suspect who then confesses, the suspect has been denied due process and has a civil rights action against his interrogators; but if the suspect is innocent rather than guilty and so has nothing to confess, the same kind of

interrogation is no violation of due process and the innocent man has no redress for violation of his due process rights. Our law has many subtleties and turnings, but such a counter-intuitive result cannot be, and is not, the law.

Controlling authority in our circuit has already decided that an attempt to coerce a confession by means that include depriving the suspect of counsel constitutes a violation of 42 U.S.C. § 1983, and that there is no qualified immunity for such an attempt. *Robichaud v. Ronan*, 351 F.2d 533 (9th Cir.1965). It is true that the facts alleged in *Robichaud* were more outrageous than the facts here—in *Robichaud* the plaintiff was confined in the drunk tank for 25 days—but the degree of brutality employed does not affect the principle. In this case the police intentionally employed forms of psychological harassment intended to produce a confession while intentionally depriving Cooper of counsel. Under *Robichaud* Cooper has a cause of action and the police have no immunity.

Our notion of due process is not that police brutality or police contempt for the law is bad solely because it produces unreliable confessions that taint the subsequent trial. Our notion of due process is that agents of the state, especially those armed with weapons and custodial authority, must be scrupulously law-abiding in their treatment of all citizens, including citizens under suspicion. In the historic case in which the Supreme Court first found police methods to be intolerable, Chief Justice Hughes not only held the coerced confessions inadmissible but declared that it "would be difficult to conceive of methods more revolting to the sense of justice." *Brown v. Mississippi*, 297 U.S. 278, 286, 56 S.Ct. 461, 465, 80 L.Ed. 682 (1936). His condemnation went to the methods as well as to the admission of the confession.

The Tucson Police Department and the Pima County Sheriff's Department did not engage in the barbarities practiced by sheriffs in rural Mississippi in the 1930's, but at a sophisticated level their calm and calculated determination to deny Cooper counsel while working on his will to produce a

confession does not conform with the requirements of due process. *Cf. Haynes v. Washington,* 373 U.S. 503, 515, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513 (1963). Due process requires that "state action, whether through one agency or another, shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions and not infrequently are designated as 'law of the land.'" *Hebert v. Louisiana,* 272 U.S. 312, 316, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926), quoted in *Brown v. Mississippi* 297 U.S. at 286, 56 S.Ct. at 465. An attempt to coerce a confession by depriving a suspect of requested counsel does not comport with justice or the law of the land.

The police department and the sheriff's department had a great public emergency on their hands. It was imperative to catch "the Prime Time Rapist." Weaver Barkman of the sheriff's department has deposed: "I weighed the interests of Michael Cooper with the interests of society and determined that it was more important to determine whether Cooper was in fact the Prime Time Rapist than it was to honor his request for an attorney." [ER, CR 199, Exh. 1, ¶ 11]. Barkman undoubtedly believed he was acting for the common good. But he had too narrow a notion of the common good. The common good includes fairness in police procedures, freedom from coercion, and access to requested counsel. Due process was violated when Barkman and his associates consciously put their professional goal of apprehending a criminal above the larger requirements of our law. The district court should be affirmed.

I concur in the affirmance of the district court on Count 5 and in the award of attorney's fees.